Civil Action Cover Sheet - Case Initiation (05/27/16) CCL 0520

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

FILED DATE: 6/29/2020 4:53 PM    2020L006904

Norwegian Air Shuttle ASA, et al.

v.

The Boeing Company and Boeing Commercial Aviation Services Europe Ltd.

No. _____

2020L006904

### CIVIL ACTION COVER SHEET - CASE INITIATION

A Civil Action Cover Sheet - Case Initiation shall be filed with the complaint in all civil actions. The information contained herein is for administrative purposes only and cannot be introduced into evidence. Please check the box in front of the appropriate case type which best characterizes your action. Only one (1) case type may be checked with this cover sheet.

Jury Demand  ☐ Yes  ☐ No

```
FILED
6/29/2020 4:53 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L006904
```

(FILE STAMP)

### PERSONAL INJURY/WRONGFUL DEATH

CASE TYPES:
- ☐ 027 Motor Vehicle
- ☐ 040 Medical Malpractice
- ☐ 047 Asbestos
- ☐ 048 Dram Shop
- ☐ 049 Product Liability
- ☐ 051 Construction Injuries
  (including Structural Work Act, Road Construction Injuries Act and negligence)
- ☐ 052 Railroad/FELA
- ☐ 053 Pediatric Lead Exposure
- ☐ 061 Other Personal Injury/Wrongful Death
- ☐ 063 Intentional Tort
- ☐ 064 Miscellaneous Statutory Action
  (Please Specify Below**)
- ☐ 065 Premises Liability
- ☐ 078 Fen-phen/Redux Litigation
- ☐ 199 Silicone Implant

### TAX & MISCELLANEOUS REMEDIES

CASE TYPES:
- ☐ 007 Confessions of Judgment
- ☐ 008 Replevin
- ☐ 009 Tax
- ☐ 015 Condemnation
- ☐ 017 Detinue
- ☐ 029 Unemployment Compensation
- ☐ 031 Foreign Transcript
- ☐ 036 Administrative Review Action
- ☐ 085 Petition to Register Foreign Judgment
- ☐ 099 All Other Extraordinary Remedies

By: Adam J. Levitt
    (Attorney)                    (Pro Se)

### COMMERCIAL LITIGATION

CASE TYPES:
- ☒ 002 Breach of Contract
- ☐ 070 Professional Malpractice
  (other than legal or medical)
- ☐ 071 Fraud (other than legal or medical)
- ☐ 072 Consumer Fraud
- ☐ 073 Breach of Warranty
- ☐ 074 Statutory Action
  (Please specify below.**)
- ☐ 075 Other Commercial Litigation
  (Please specify below.**)
- ☐ 076 Retaliatory Discharge

### OTHER ACTIONS

CASE TYPES:
- ☐ 062 Property Damage
- ☐ 066 Legal Malpractice
- ☐ 077 Libel/Slander
- ☐ 079 Petition for Qualified Orders
- ☐ 084 Petition to Issue Subpoena
- ☐ 100 Petition for Discovery

** _____

_____

Primary Email: Alevitt@dicellolevitt.com

Secondary Email: _____

Tertiary Email: mcook@dicellolevitt.com

**Pro Se Only:** ☐ I have read and agree to the terms of the *Clerk's Office Electronic Notice Policy* and choose to opt in to electronic notice form the **Clerk's Office** for this case at this email address: _____

## DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

FILED
6/29/2020 4:53 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L006904

FILED DATE: 6/29/2020 4:53 PM   2020L006904

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| NORWEGIAN AIR SHUTTLE ASA and ARCTIC AVIATION ASSETS DAC, ) ) ) | |
| Plaintiffs, ) | 2020L006904<br>Case No. _____ |
| ) | |
| v. ) | |
| ) | |
| THE BOEING COMPANY and BOEING ) COMMERCIAL AVIATION SERVICES ) EUROPE LIMITED, ) ) | **JURY TRIAL DEMANDED** |
| Defendants. ) | |

**COMPLAINT FOR RESCISSION AND DAMAGES BASED UPON**
**FRAUD, BREACH OF CONTRACT, AND GROSS NEGLIGENCE**

Plaintiffs Norwegian Air Shuttle ASA and Arctic Aviation Assets DAC (collectively, "Norwegian"), by their undersigned counsel, bring this action for relief against The Boeing Company and Boeing Commercial Aviation Services Europe Limited ("BCASEL" and, together with The Boeing Company, "Boeing") and in support thereof state as follows:

**INTRODUCTION**

1.      This action arises out of Boeing's gross negligence, fraud, and breach of contract relating to Boeing's newest airplanes, the 737 MAX (the "MAX") and the 787 Dreamliner (the "787"). Norwegian ordered large numbers of both aircraft types based on specific promises from Boeing. Instead of delivering what it promised, Boeing engaged in a pattern of intentional misrepresentation and omission, gross negligence, and shoddy manufacturing, producing aircraft with substantially impaired value and utility and, in the case of the MAX, tragic and deadly

FILED DATE: 6/29/2020 4:53 PM   2020L006904

consequences.  Boeing must take its defective planes back and compensate Norwegian for the enormous economic damage Boeing's conduct has caused Norwegian.

2.      To induce Norwegian to purchase the MAX, Boeing promised that it would deliver a new version of the 737 Next Generation (the "NG"), one of the most popular commercial jetliners in history, that would offer significantly better fuel efficiency but would otherwise have the same flight properties as the NG, would not require any additional pilot training, and would cost less to operate and hold its value better than the competing Airbus model.  Boeing also represented and warranted that the MAX would be airworthy, safe, free from design defects, and in compliance with appropriate aviation regulations.

3.      Relying on these and other representations by Boeing, Norwegian agreed to buy 110 MAX airplanes and Boeing maintenance for those planes in a deal worth billions of dollars. Unbeknownst to Norwegian, however, Boeing's representations about the MAX were a pack of lies.

4.      Boeing's guiding principle in developing the MAX was not safety, but, rather, speeding the MAX to market and generating profits.  In doing so, Boeing repeatedly concealed information from the FAA, the airlines, and the public.  Boeing applied relentless pressure on its engineers from the outset of the program to prioritize speed over quality, deliberately "jedi mind tricked" the FAA into approving the plane's design in the words of its own employees, and systematically cut corners along the way in a highly flawed design process that produced a highly flawed airplane.

5.      Boeing's own employees were unsparing in criticizing the MAX in private, telling one another in emails and internal messages "***this airplane is designed by clowns, who are in turn supervised by monkeys***;" that it had a "***piss poor design***" and was "***doomed***;" and that they

FILED DATE: 6/29/2020 4:53 PM    2020L006904

would never put their families "on a Max simulator trained aircraft."[1]  Norwegian knew none of this.  In public, Boeing kept selling Norwegian and other customers a bogus story about a safe, state-of-the-art plane that Boeing knew it was not actually building.  The consequences of Boeing's haste and disregard for safety would prove to be deadly.

6.      From the outset, Boeing conceived of the MAX as a way to compete with Airbus' updated version of its own narrow-body plane, the A320neo, which Airbus had retrofitted with newer engines to make the plane significantly more fuel efficient than its predecessor, the A320. With A320neo sales skyrocketing, Boeing knew that it quickly needed a fuel-efficient competitor, but that the only way it could accomplish that goal was to dramatically enlarge the NG's engines.

7.      Because the huge new engines did not fit under the NG's wings, however, Boeing needed to move them in front of the wings and up on new engine pylons, thus altering the MAX's center of gravity and flight characteristics and causing the MAX to pitch upward during takeoff and other high thrust flight maneuvers, endangering both passengers and crew.  If a plane's nose rises too much, the plane can enter an aerodynamic stall, which can lead to a crash.

8.      Boeing's engineers fully understood this problem, having considered the possibility of putting larger engines on the NG years before, and could have solved the problem by modifying the NG's design, but that would have cost time and money.  Instead, Boeing decided to conceal the problem and turn to a hastily developed, and fundamentally unsafe, piece of new software so that it could begin shipping MAXs to customers as soon as possible.

---

[1] Emails and internal messages between Boeing employees were released by Boeing to the U.S. Congress, are hosted by, among others, the *New York Times*, and are available at https://int.nyt.com/data/documenthelper/6653-internal-boeing-communications/ 606e3fda752a935bc0df/optimized/full.pdf.

FILED DATE: 6/29/2020 4:53 PM   2020L006904

9.      Boeing's new software, an automated system it called the Maneuvering Characteristics Augmentation System ("MCAS"), had no redundancy, yet had tremendous influence over the airplane's performance.  It was designed to override the pilots and force the airplane's nose down—even if the pilots were trying to pull up—if data from a single, issue-prone angle-of-attack ("AOA") sensor indicated the plane was climbing too rapidly.  If the AOA sensor were damaged or fed the flight control computer with erroneous data, MCAS would force the MAX into a dive, by commanding the horizontal stabilizer to swivel to an airplane nose down position.

10.     Boeing intentionally concealed from Norwegian and other customers that the MAX was imbalanced and never mentioned MCAS, its flawed design, or the fact that it would force the nose of the plane down, even when pilots were trying to pull the nose up.  Indeed, Boeing did not disclose the existence of MCAS to either customers or pilots.  Instead, Boeing told Norwegian and other customers was that "737 flight crews will feel at home in the MAX," that the MAX offered "aerodynamic improvement" as compared to the NG, and that "[o]nce the engines are started, all procedures to operate the NG and MAX are identical."  Pilots of the MAX aircraft whose MCAS had erroneously activated had no idea why their airplane was diving and resisting their efforts to pull the airplane nose up and regain aircraft control.

11.     A key part of Boeing's sales strategy was to assure buyers such as Norwegian that their existing NG pilots would require no additional flight simulator training to operate the MAX, a promise of enormous value to airlines such as Norwegian with large numbers of NGs in their fleets.  Boeing knew that it was highly unlikely to win FAA permission not to require pilot training for the MAX without lying to the regulators and concealing the significance of the new flight control software.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

12.     Boeing's scheme succeeded.  After relentless pressure and deception, Boeing won regulatory approval for the MAX, without any requirement that pilots undergo simulator training.  Boeing's team could hardly believe it, writing "***you can be away from an NG for 30-years and still be able to jump into a MAX?  LOVE IT!!***"  Boeing began delivering MAXs to customers in May 2017.

13.     On October 29, 2018, a nearly new MAX operated by Lion Air crashed just minutes after takeoff, because MCAS forced the plane into a dive from which the pilots—who were unaware that MCAS even existed—could not recover.  Boeing responded by insisting that the MAX was safe and increasing its production rate—decisions that Boeing's then-CEO later testified were mistakes.  In a truly sinister turn, after aggressively fighting any effort to provide simulator training to pilots, Boeing *blamed the pilots* for the crash.

14.     Five months later, on March 10, 2019, a second MAX operated by Ethiopian Airlines crashed, again, minutes after takeoff and as a result of MCAS erroneously forcing the plane to dive.  346 passengers and crew lost their lives in the Lion Air and Ethiopian Airlines tragedies.

15.     Global regulators responded to the Lion Air and Ethiopian Airlines crashes by grounding all MAX aircraft.  As a result, Norwegian has been unable to use the eighteen MAXs it had already received from Boeing since March 12, 2019 and has had to leave $1 billion worth of aircraft sitting on the tarmac and in storage.

16.     In December 2019, Boeing announced that it was halting production of the MAX until further notice and fired its CEO.  In January 2020, Boeing announced that simulator training for pilots would be needed if the MAX ever takes to the skies again.

17.     Boeing engaged in similar conduct in connection with the 787.  Boeing promised that the 787 would be a revolutionary plane that would offer Norwegian substantial operational and cost savings and the ability to offer passengers a premium flying experience.  Norwegian paid top dollar for a fleet of 787s, but they have been an operational disaster and have failed to bring any of the cost benefits or competitive advantages that Boeing promised.

18.     Like the MAX, the 787s Boeing delivered to Norwegian suffer from extraordinary defects and are the product of shoddy manufacturing.  Boeing's own employees repeatedly complained that the 787 manufacturing process was so rushed that "foreign object debris" was routinely left inside finished aircraft, including tools, metal shavings, and even an entire ladder. Boeing employees pleaded with the company that sloppy work risked operational problems and failures."[2]  Boeing ignored all of these concerns, as well as multiple whistleblower complaints filed by employees, and pressed ahead in a rush to get the 787 to market.

19.     The 787s Boeing delivered to Norwegian have experienced such severe issues that Norwegian has repeatedly been forced to ground the planes for heavy maintenance, at times for months.  Norwegian has had to replace the engines on its 787 aircraft more hundreds of times—an extraordinary number of times, particularly for new aircraft.  Norwegian has experienced continual reliability problems with its 787s and has been forced to lease substitute aircraft to replace 787s that are out of service for maintenance in each year Norwegian has owned 787s.  These issues have caused substantial harm to Norwegian, including by harming Norwegian's ability to plan its route network and flight schedules with any certainty.  Boeing has refused to address these issues, and has instead sought to force Norwegian to accept five

---

[2] Natalie Kitreoff and David Gelles, *Claims of Shoddy Production Draw Scrutiny to a Second Boeing Jet*, New York Times, April 20, 2019, https://www.nytimes.com/2019/04/20/business/boeing-dreamliner-production-problems.html.

FILED DATE: 6/29/2020 4:53 PM     2020L006904

additional 787s that Boeing knows are defective and likely to be out of service for maintenance at least 20 percent of the time.

20.     As a result of Boeing's actions, Norwegian has suffered, and is continuing to suffer, significant financial and reputational damage.  Norwegian brings this action for just and equitable relief for the damage Boeing has caused.

## PARTIES

*Plaintiffs*

21.     Norwegian Air Shuttle ASA is a public limited corporation, incorporated and existing under the laws of Norway, with its corporate headquarters and principal place of business in Fornebu, Norway.

22.     Arctic Aviation Assets DAC is a designated activity company, incorporated and existing under the laws of Ireland, with its corporate headquarters in Dublin, Ireland.  Arctic Aviation Assets DAC is a wholly-owned subsidiary of Norwegian Air Shuttle ASA.

*Defendants*

23.     The Boeing Company is a corporation incorporated and existing under the laws of Delaware, with its corporate headquarters and principal place of business in Chicago, Illinois.

24.     Boeing Commercial Aviation Services Europe Limited is a private limited company incorporated and existing under the laws of the United Kingdom, with its corporate headquarters and principal place of business in London, England.

25.     At all relevant times, Boeing was engaged in the business of designing, manufacturing, integrating, assembling, modifying, maintaining, inspecting, testing, servicing, marketing, distributing, and selling aircraft, including the MAX and 787.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

FILED DATE: 6/29/2020 4:53 PM   2020L006904

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over this action because The Boeing Company is a resident and citizen of the State of Illinois and maintains its principal place of business in this state, and because the action, as it pertains to BCASEL, relates to transactions BCASEL entered into with the Boeing Company.

27.     Venue is proper in Cook County because The Boeing Company resides and conducts business in Cook County through its corporate headquarters in Chicago, Illinois, and because a substantial portion of the conduct relating to BCASEL took place within and/or relates to transactions with an Illinois entity.

## FACTUAL BACKGROUND

### The Boeing 737

28.     Boeing first developed the 737 aircraft type in the mid-1960s.  The first version of the 737, the Boeing 737-100, entered service in 1967 and had a length of 94 feet and a maximum capacity of 115 passengers.  The 737-200, which entered service in 1968, was slightly larger and carried a maximum of 130 passengers.

29.     Boeing has since updated the 737 many times, and its sales have made the 737 a phenomenal success for Boeing.  Variants have included the 737 "original" – 737-100 / 737-200 series; the 737 "classic" – 737-300 / 737-400 & 737-500 series, which Boeing manufactured between 1984 and 2000; the 737 NG series – 737-600 / 737-700 / 737-800 & 737-900, which Boeing developed starting in the mid-1990s and has delivered since 1997; and the MAX series, which consists of the MAX 7, MAX 8, MAX 9, and MAX 10 (737-7 / 737-8 / 737-9 / 737-10) variants.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

30.     The 737 family of aircraft has been described as "the highest-selling commercial jetliner in history," with more than 10,000 manufactured since Boeing first introduced the aircraft type more than 50 years ago.[3]  Each of the 737 aircraft shares certain common design features, including being situated relatively low to the ground, relative to their principal competitor, the Airbus A320.

**Boeing Rushes to Design the MAX to Maintain Profits**

31.     Within the airline manufacturing industry, there exists a global duopoly between Boeing and Airbus SE ("Airbus"), with the two companies together comprising the vast majority of commercial jet orders worldwide.

32.     In the mid-1980s, Airbus began developing the A320—an airplane that would compete with the 737.  Airbus began delivering A320s in 1988 and has since delivered nearly 9,000 A320-family aircraft to customers.  The A320 remains the principal competitor to the Boeing 737 and is likewise one of the best-selling aircraft types in commercial aviation history.

33.     By 2010, many at Boeing believed that Boeing should develop a new, single-aisle aircraft to replace the 737, rather than building a fourth generation 737.  Building another 737 meant Boeing would have to work within a 50 year-old design.

34.     While Boeing was debating whether to develop a new version of the 737 or an entirely new airplane, Airbus announced in December 2010 that it would offer a "re-engined" version of the A320, dubbed the A320 "New Engine Option" or "neo."  The A320neo would be

---

[3] *See, e.g., Top Selling Airplanes in Commercial Aviation History*, Poente Technical Ltd. (Nov. 6, 2018), https://www.poentetechnical.com/airplanes/top-selling-airplanes-in-commercial-aviation-history/.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

equipped with newer, larger engines and other modifications that would make it, according to Airbus, "the world's most advanced and fuel-efficient single-aisle aircraft."[4]

35.    Boeing knew that it could not develop and obtain regulatory approval for a new airplane designed from scratch before Airbus began delivering A320neos to customers, and that the only way to get a competitive product to market quickly was to re-engine the 737 NG to make it more fuel efficient.  Re-engined aircraft take significantly less time to develop than new designs and are also certified far more quickly by regulators because they are considered "derivatives," rather than new aircraft.

36.    As late as February 2011, Boeing continued to plan for a new aircraft design rather than a re-engining option.  As Boeing's chair and CEO at the time, James McNerney, stated, "our current bias is to move to a newer airplane, an all-new airplane, at the end of the decade, beginning of the next decade.  It's our judgment that our customers will wait for us."[5]

37.    Around that same time, the then-CEO of Boeing Commercial Airplanes, James F. Albaugh, criticized the decision to re-engine the A320 with bigger engines in a meeting with Boeing employees, telling them that the larger engines would alter the aerodynamics of the plane and require big changes to the A320.  As he put it, "It's going to be a design change that will ripple through the airplane.  I think they'll find it more challenging than they think it will be."[6]

---

[4]  *A320: Unbeatable Fuel Efficiency*, Airbus, https://www.airbus.com/aircraft/passenger-aircraft/a320-family/a320neo.html.

[5]  Joshua Freed, *Boeing CEO: 'New Airplane' to Replace 737*, NBC News, Feb. 10, 2011, http://www.nbcnews.com/id/41517601/ns/business-us_business/t/boeing-ceo-new-airplane-replace.

[6]  David Gelles, Natalie Kitreoff, and Rebecca Ruiz, *Boeing Was 'Go, Go, Go' to Beat Airbus With the 737 MAX*, New York Times, Mar. 23, 2019, https://www.nytimes.com/2019/03/23/business/boeing-737-max-crash.html.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

38. All of that changed later in 2011, when Boeing learned that some of its most important customers, including American Airlines, were planning to place large orders with Airbus for A320neos. Boeing stood to lose a tremendous amount of money and market share if it fell behind Airbus in the production of fuel-efficient narrow-body airplanes. Boeing determined that it would take too long to design and manufacture a new airplane to compete with the Airbus A320neo, and, instead, decided to use its existing 737 model, the NG, as the basis for what would become the MAX.

39. In August 2011, Boeing's Board of Directors approved the launch of the MAX program.

40. Boeing's decision—made at the company's highest levels—to use the existing NG design, rather than design an entirely new airplane, was made to increase Boeing's profit, because:

a. Using the existing design saved Boeing significant design and development costs;

b. Using the existing design permitted Boeing to expedite the design and manufacture of the MAX and get it to market quickly so that Boeing could reduce business lost to Airbus;

c. Using the existing design permitted Boeing to offer the MAX to its customers, including Norwegian, with the selling point that pilots already qualified to fly the NG could move to the MAX without undergoing any meaningful transition training, and without needing to be trained and tested in flight simulators and/or in the airplane before flying revenue flights;

d. Using the existing design permitted Boeing to take advantage of its Organization Designation Authorization (ODA), granted to it by the FAA, to streamline

11

FILED DATE: 6/29/2020 4:53 PM    2020L006904

and speed the certification of the MAX as an amendment to the Boeing 737 FAA TCDS (Type Certificate Data Sheet), AW16E; and

  e. Using the existing design permitted Boeing to produce an updated, fuel-efficient airplane to compete with the Airbus A320neo more quickly and cheaply than if Boeing had developed a new model airplane.

**Norwegian and Many Others Are Induced to Order the MAX**

  41. Boeing aggressively marketed the MAX to Norwegian as building on the NG, which it calls "the world's most reliable airplane,"[7] and made specific promises about the MAX's similarity to the NG to induce Norwegian and other buyers to order the MAX.

  42. Boeing promised, and to this day continues to promise, that "the 737 MAX, building on the record-setting 99.7% schedule reliability record of the Next-Generation, helps airlines keep flight operations and maintenance operations running on schedule."[8]

  43. Boeing similarly promised, and continues to promise, that "because of the 737's popularity with airlines everywhere around the world, integrating the new 737 MAX is an easy proposition. As you build your 737 MAX fleet, millions of dollars will be saved because of its commonality with the Next-Generation 737, ease of maintenance, wide availability of 737 pilots, and the global infrastructure that supports the aircraft in operation."[9]

  44. Boeing's efforts to induce Norwegian to buy the MAX included a particular focus on the alleged similarities between the MAX and the NG and the fact that no new pilot training would be required for an NG operator such as Norwegian to incorporate MAXs into its fleet.

---

[7] *737 MAX by Design: 737 is the World's Most Reliable Airplane*, Boeing, https://www.boeing.com/commercial/737max/by-design/#/ng-most-reliable.

[8] *Id.*

[9] *737 MAX by Design: Operational Commonality*, Boeing, https://www.boeing.com/commercial/737max/by-design/#/operational-commonality.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

Boeing repeatedly stressed that the only aerodynamic differences between the MAX and the NG were "improvements" and that—unlike if Norwegian wanted to switch to the A320neo— Norwegian's NG pilots would not require any new flight simulator training to operate the MAX. Boeing also emphasized that the MAX would have substantially higher residual values than the A320neo.

45.     Boeing stressed all of these points in a series of presentations that Boeing gave to senior Norwegian officials on December 8, 2011, aimed at persuading Norwegian to place an order for MAX aircraft.

46.     David Roberts, Boeing's Regional Marketing Director, presented a slide deck to Norwegian stating unequivocally that were would be "No Simulators" needed for NG pilots to operate the MAX and that Boeing "Estimate[s] a $3.9M residual value advantage for MAX8 versus A320NEO." By contrast, Roberts argued, "[s]witching to A320NEO would be a long (7-8 years) & inefficient process" due to the need for NG pilots to undergo additional training to fly the competing Airbus plane.

47.     Matt Wilks, then a Managing Director in Boeing's Product Marketing division, echoed the same themes in his own December 8, 2011 presentation to Norwegian, telling Norwegian that the MAX offered "Higher residual value" and "simple pilot transition" and that Boeing's design allowed the MAX to achieve better range and fuel efficiency through enlarged engines "without structural or aerodynamic compromises."

48.     Boeing repeatedly reiterated these false promises to Norwegian to induce Norwegian to remain with the MAX program and to order more MAX aircraft. For instance, Boeing's Chief Technical Pilot for the MAX program, Mark Forkner, gave a presentation on the differences between the NG and the MAX to Norwegian on March 29, 2017 that stated "KEY

FILED DATE: 6/29/2020 4:53 PM    2020L006904

POINT: Once the engines are started, all procedures to operate the NG and MAX are identical (gear lever). Therefore no simulator training required to transition from NG to MAX." Forkner's presentation also stressed that there would be "[n]o changes to memory items," referring to procedures NG pilots would be required to memorize to fly the MAX.

49.     Nowhere in this presentation—or any other presentation—did Boeing mention MCAS, which did not exist on the NG, the problems that led Boeing to develop MCAS, or any of the other myriad issues Boeing knew it was facing with the MAX.

50.     Boeing also promised Norwegian and other customers that the MAX would be state of the art. Boeing never delivered, or even planned to deliver on this promise. Instead, it sought permission from the FAA to have the MAX's flight controls and cockpit layout only meet the standards and layout of its outdated, predecessor aircraft. Boeing expressly told the FAA that the reason for its request was to save billions of dollars and that the MAX would be safe without up-to-date pilot information technology. In fact, the outdated cockpit design and pilot warning systems played a significant role in the two crashes that occurred on MAX aircraft.[10]

51.     Boeing's efforts to market and sell the MAX were wildly successful. In Boeing's words, "the 737 MAX is the fastest-selling airplane in Boeing history with about 5,000 orders from more than 100 customers worldwide."[11]

52.     Boeing, however, never disclosed the issues that larger engines could cause, as the CEO of Boeing Commercial Airplanes had already previewed to employees in the context of the A320neo, including: (a) changing the aircraft's center of gravity; (b) decreasing aircraft

---

[10] Joint Authorities Technical Review, Fed. Aviation Admin., *Boeing 737 MAX Flight Control System: Observations, Findings, and Recommendations* 7 (2019), https://www.faa.gov/news/media/attachments/Final_JATR_Submittal_to_FAA_Oct_2019.pdf.

[11] *See 737 MAX*, Boeing, https://www.boeing.com/commercial/737max/.

14

FILED DATE: 6/29/2020 4:53 PM    2020L006904

stability; and (c) negatively affecting flight handling characteristics to make the aircraft more susceptible to the catastrophic risk of aerodynamic stall.

53.     Norwegian was an early buyer of the MAX.  On January 20, 2012, Norwegian entered into Purchase Agreement Number PA-03745 with Boeing (the "737 Purchase Agreement"), pursuant to which Norwegian agreed to purchase 100 Boeing Model 737-8 aircraft, also known as MAX 8 aircraft.

54.     The 737 Purchase Agreement incorporated the terms and conditions of an Aircraft General Terms Agreement dated August 29, 2007, which was identified as AGTA-NSB (the "AGTA").

55.     The 737 Purchase Agreement also incorporated various letter agreements as set forth on page 3 of the Purchase Agreement.

56.     The 737 Purchase Agreement and all other relevant amendments, letter agreements, and contracts between Norwegian and Boeing are governed by Washington state law.

57.     On February 26, 2013, Boeing and Norwegian entered into Supplemental Agreement No. 1, which revised the number of aircraft to be delivered in the first three years of the contract.

58.     On November 27, 2014, Norwegian Air Shuttle ASA and Arctic Aviation Assets DAC entered into an Assignment, Assumption, and Release Agreement whereby Norwegian Air Shuttle ASA assigned certain of its rights to the MAX aircraft to Arctic Aviation Assets DAC.

59.     On June 7, 2017, Boeing and Norwegian entered into Supplemental Agreement No. 3, which, among other things, increased the number of MAXs Norwegian was purchasing to 110.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

60.     These agreements include specific promises from Boeing, including promises concerning the number of aircraft Boeing would deliver and the dates of delivery.  Boeing also provided an express contractual warranty under the AGTA in which Boeing agreed that the aircraft and its component parts would be free from defects in design and construction and "state of the art."

61.     Boeing agreed to a set delivery schedule for Norwegian's order and further agreed that Norwegian could terminate any orders delayed by more than 180 days if the delay was "Non-Excusable" and could terminate orders delayed by more than a year even if the delay was "Excusable."  Boeing delivered eighteen defective MAXs to Norwegian prior to the grounding and is more than 180 days late in delivering a further sixteen MAXs.

### Boeing's Defective and Rushed Design Process

62.     The Boeing design process for the MAX was fatally flawed.  In its race to keep up with Airbus, Boeing cut corners, ignored its usual design process, and applied great pressure on its teams to get the MAX developed quickly.  According to the *New York Times*, "[o]ne former designer on the team working on flight controls for the MAX said the group had at times produced 16 technical drawings a week, double the normal rate."[12]

63.     By mid-2012, Boeing management had already decided to drastically reduce the work hours involved in avionics regression testing on the MAX by 2,000 hours, flight test support by 3,000 hours, and the engineering flight deck simulator by 8,000 hours, knowingly jeopardizing safety to save money.[13]

---

[12] Gelles, *et al.*, *Boeing Was 'Go, Go, Go'*, *supra* at 6.

[13] H. Rep. Cmte. on Transportation and Infrastructure, *The Boeing 737 MAX Aircraft: Costs, Consequences, and Lessons from its Design, Development, and Certification – Preliminary Investigative Findings* (Mar. 6, 2020), https://transportation.house.gov/imo/media/

FILED DATE: 6/29/2020 4:53 PM    2020L006904

64.    Boeing management also insisted that no changes be made to the NG that would trigger additional FAA scrutiny or pilot training requirements.   The *Wall Street Journal* quoted Rick Ludtke, a cockpit designer on the MAX, as saying "the pressure on us" to avoid changes that would cause delay or trigger additional pilot training requirements "was huge."[14]   The same article cited Ludtke as saying that "company managers put pressure on engineers to avoid tweaks in designs that could result in pilots needing to learn new maneuvers in a simulator."

65.    In its rush to develop the MAX and get it to market, Boeing drove its employees to unsafe work production levels and ignored complaints that its production schedule was unsafe. Current and former Boeing employees described the timeline for the design as being "extremely compressed."[15]

66.    The rushed timeline meant that technicians were receiving sloppy blueprints from designers of the MAX.  A technician who assembles wiring on the MAX said that these issues were never fixed and that the internal assembly designs for the MAX still include omissions today, including not specifying which tools to use to install a certain wire, a situation that could lead to a faulty connection.[16]  Normally such blueprints include intricate instructions.

67.    Boeing ignored its employees' concerns that its work production expectations and production schedule were causing manufacturing mistakes that posed safety risks.   When one Boeing employee, Mark Rabin, who conducted flight-testing work on the MAX, raised safety concerns to his managers, he was told: "Don't rock the boat. You don't want to be upsetting

---

doc/TI%20Preliminary%20Investigative%20Findings%20Boeing%20737%20MAX%20March%202020.pdf.

[14] Andrew Tangel, Andy Pasztor, and Mark Maremont, *The Four-Second Catastrophe: How Boeing Doomed the 737 MAX*, Wall Street Journal, Aug. 16, 2019, https://www.wsj.com/articles/the-four-second-catastrophe-how-boeing-doomed-the-737-max-11565966629.

[15] Gelles, *et al.*, *Boeing Was 'Go, Go, Go'*, *supra* at 6.

[16] *Id.*

FILED DATE: 6/29/2020 4:53 PM   2020L006904

executives."[17]   When a plant supervisor at Boeing's Renton, Washington plant recommended shutting down the production line for a short time to address safety concerns caused by the rushed production process, Boeing management ignored him and, instead, ramped production up.[18]

68.    Boeing even ignored its employees' complaints that its work production expectations and production schedule had caused foreign object debris to be left in MAX airplanes, which could pose dangers to the airplane's wiring, including wiring associated with the airplane's AOA sensors and the flight control computer.

69.    Boeing's new CEO, David Calhoun, has admitted that Boeing's production rush, while causing profits to skyrocket, compromised quality.[19]

70.    Boeing was not only focused on speed, but also on slashing cost.   Boeing reportedly outsourced many important tasks to temporary workers in developing countries earning as little as $9 an hour, including using these workers to develop and test software.   As one former Boeing flight control engineer put it, "Boeing was doing all kinds of things, everything you can imagine, to reduce cost, including moving work from Puget Sound, because we'd become very expensive here."[20]

---

[17] Dominic Gates and Mike Baker, *The Inside Story of MCAS: How Boeing's 737 MAX System Gained Power and Lost Safeguards*, Seattle Times, June 24, 2019, https://www.seattletimes.com/seattle-news/times-watchdog/the-inside-story-of-mcas-how-boeings-737-max-system-gained-power-and-lost-safeguards/.

[18] H. Rep. Cmte. on Transportation and Infrastructure, *The Boeing 737 MAX Aircraft: Costs, Consequences, and Lessons from its Design, Development, and Certification*.

[19] Natalie Kitroeff and David Gelles, *'It's More Than I Imagined': Boeing's New C.E.O. Confronts Its Challenges*, New York Times (Mar. 5, 2020), https://www.nytimes.com/2020/03/05/business/boeing-david-calhoun.html.

[20] Peter Robison, *Boeing's 737 Max Software Outsourced to $9-an-Hour Engineers*, Bloomberg (June 28, 2019, https://www.bloomberg.com/news/articles/2019-06-28/boeing-s-737-max-software-outsourced-to-9-an-hour-engineers.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

71.    Outsourcing important tasks was not the only way Boeing put cost-cutting and profits above safety.  Initially, Boeing considered implementing a system called the Engine-Indicating and Crew-Alerting System ("EICAS") on the MAX.  EICAS was developed by Boeing in the early 1980s for its 757 and 767 aircraft.  EICAS provides pilots visual, aural, and tactile warnings, as well as written messages on the main flight display, when things go wrong with either the engines or with the airplane systems and recommends the remedial action needed. EICAS has been installed in some version on every Boeing aircraft type since the 1980s, except for the 737.  However, according to an internal Boeing ethics complaint, the plan to put EICAS on the MAX was scrapped due to "the overall cost."[21]  Instead, Boeing continued to use the antiquated flight deck alert system that no other aircraft type in the Boeing catalog was using.

72.    However, such an antiquated system ran afoul of FAA regulations, so Boeing went to the FAA to convince it to make an exception for the MAX.  Boeing secured the exception, in part, by making false claims about the MAX being identical to past 737 models, using the safety of past 737 models as a predictor for the supposedly similar MAX.  Boeing also stated that complying with FAA cockpit alert regulations was "impractical," because doing so would cost Boeing $10 billion, including costs for pilot training and documentation changes in flight crew manuals.

73.    Boeing sought exceptions rather than exemptions, because an exemption would have required publishing the request in the Federal Register for public comment, while an exception would be kept secret from the public.  Boeing successfully received an exception to a

---

[21] Dominic Gates, Steve Miletich, and Lewis Kamb, *Boeing pushed FAA to relax 737 MAX certification requirements for crew alerts*, Seattle Times, Oct. 2, 2019, https://www.seattletimes.com/business/boeing-aerospace/boeing-pushed-faa-to-arelax-737-max-certification-requirements-for-crew-alerts/.

number of requirements in the regulations, including, crucially, the requirement that the system be designed to minimize the effects of false and nuisance alerts.

74.     Boeing's speed and cost goals also overlapped.  Boeing reportedly promised Southwest Airlines—its launch customer for the MAX—that Boeing would pay Southwest $1 million per aircraft in compensation if the FAA required NG pilots to undergo simulator training to operate the MAX.  Boeing did everything in its power to avoid paying that price.

**The Defects from Using the 737 Model Necessitate the Creation of MCAS**

75.     Boeing's primary engineering objective in designing the MAX was to increase its fuel efficiency.  Boeing could achieve some fuel efficiency gains with minor adjustments to the MAX's design, such as adding fuel-saving wing tips, known on the MAX as AT (Advanced Technology) Winglets, and adjusting the tail's design to reduce vortexes and aerodynamic drag. But to achieve fuel consumption reductions on par with the A320neo, Boeing needed to retrofit the MAX with significantly larger engines.

76.     The need to add larger engines posed a particular challenge for Boeing because the 737, which dates back to the 1960s, is significantly lower to the ground than the A320.  The 737's low design was originally a benefit for airlines and airports in developing countries, as it meant that workers could load bags by hand without a conveyor belt and maintain the engines without a lift.  When it came to re-engining the NG, however, the low frame posed a serious challenge because the new, larger engines did not fit under the 737 NG's wings.

77.     In designing the MAX, Boeing determined that it would replace the CFM56-7B engines used in the NG with larger, more fuel-efficient CFM LEAP-1B engines.  Those engines did not fit under the wings, and Boeing could not extend the landing gear enough to solve the problem without violating FAA regulations on emergency exit requirements.  Boeing's solution

FILED DATE: 6/29/2020 4:53 PM    2020L006904

FILED DATE: 6/29/2020 4:53 PM    2020L006904

was to modify the MAX's nose gear by making it eight inches taller and to mount the engines higher and further forward on the MAX's wings on new engine pylons.

78.     The solution solved the engine placement problem, but Boeing quickly discovered that the engines' increased thrust, new location, and larger engine cowlings gave the MAX a propensity to abnormally pitch up under certain flight parameters, creating a risk that the airplane would suffer an aerodynamic stall and crash.

79.     Boeing knew that it would never be able to obtain FAA certification for the MAX without a solution to the nose-up tendency in its new MAX design. Pursuant to the FAA's Airworthiness Standards for Commercial Aircraft: "No abnormal nose-up pitching may occur…. In addition, it must be possible to promptly prevent stalling and to recover from a stall by normal use of the controls."[22]

80.     Boeing attempted to make minor modifications to the MAX to address this problem, but none of the changes it explored worked. Redesigning the aircraft more fundamentally to address its aerodynamic problems would have meant that the MAX would be a new aircraft type, rather than a continuation of the 737 line, requiring extensive certification and training requirements. To avoid this, Boeing resorted to a software fix that would mask the MAX's nose-up tendency and make the MAX appear to handle similarly to the NG—even though, in fact, the MAX handled quite differently.

81.     MCAS was essential to Boeing's aggressive business plan of quickly designing, manufacturing, and selling the MAX, because the airplane would not have otherwise been certifiable as airworthy by the FAA, and Boeing would not have been able to compete with the A320neo without it.

_____

[22] 14 C.F.R. § 25.203(a) – Stall Characteristics.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

**Boeing's MCAS Solution**

82.     MCAS is a software system Boeing developed exclusively for the MAX,[23] which works by swiveling the horizontal stabilizer on the MAX's tail (to an airplane nose down position) to adjust the aircraft's pitch based on data the flight control computer receives from an AOA sensor. As Boeing admits, MCAS "was designed…so that [the MAX] feels and flies like other 737s,"[24] even though the MAX, on its own, does not actually feel or fly like other 737s. As Boeing has admitted in answers to other lawsuits against it, "MCAS provides an automatic nose down pitch input using movement of the horizontal stabilizer."[25]

83.     Boeing purposely designed MCAS as a sub-part of the SPEED TRIM system in the MAX's flight control computer to avoid regulatory scrutiny and additional training requirements that a new system would mandate. The SPEED TRIM system was originally introduced on the 737 Classic to help pilots keep the aircraft in proper trim after takeoff and before the autopilot was engaged. The SPEED TRIM system on the NG and other MAX predecessors could move the stabilizer both up and down in order to help maintain trim and airspeed, but was easily disabled by pulling back or pushing forward on the yoke. MCAS, as detailed below, is radically different from the traditional SPEED TRIM system.

84.     Initially, Boeing designed MCAS to activate in rare circumstances and to have limited power. MCAS was engineered to move the horizontal stabilizer by no more than 0.6

---

[23] A different version of MCAS was implemented in the Boeing KC-46 Pegasus, essentially a military version of the Boeing 767 used as an aerial refueling tanker. MCAS on the KC-46, unlike the MAX's MCAS, relied on data from both AOA sensors and could be disengaged with stick input from the pilot.

[24] *737 MAX Software Updates*, Boeing, https://www.boeing.com/commercial/737max/737-max-software-updates.page (last visited June 27, 2020).

[25] *See, e.g.*, Answer at 12, *In re Ethiopian Airlines Flight ET 302 Crash*, No. 1:19-cv-02170 (N.D. Ill. June 27, 2019), E.C.F. 91.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

degrees and to activate only in extreme maneuvers. In particular, MCAS was needed to ensure an appropriate amount of tension would exist on the aircraft's yoke during a banked spiral at high speeds and altitudes.

85.     Because the early version of MCAS was intended for limited circumstances, it was designed with multiple safeguards. The initial MCAS design took data from two AOA sensors, which are designed to detect the angle at which the plane is flying. The system was also designed to activate only after a third sensor, which detects G-forces, indicated the MAX was flying at high speeds and under the unusual conditions in which MCAS was deemed necessary to properly control the plane.

86.     Boeing described this version of MCAS to FAA regulators, who agreed that it was not safety-critical and that it was appropriate to delegate additional safety analysis of the system to Boeing.

**Boeing Changes MCAS to be More Powerful with Fewer Safeguards**

87.     During flight testing in 2016, Boeing discovered that the aerodynamic handling problems created by the MAX's enlarged engines and engine placement were far more prevalent, and affected flight in low speed situations, and not just in rare, high-speed maneuvers. Test pilots found that the same lack of smooth control stick forces was also occurring in certain low-speed, low-altitude conditions.

88.     Once again, rather than redesigning the aerodynamics, Boeing resorted to further software "fixes," because physical solutions would have cost time and money and would have made certification more time consuming and additional training requirements more likely.

89.     Instead, Boeing decided to make substantial changes to MCAS to attempt to make the MAX fly acceptably in lower speed situations. To make MCAS work in low-speed

situations, Boeing quadrupled its power, enabling MCAS to move the stabilizer 2.5 degrees, instead of only the original 0.6 degrees. This change was necessary because a control surface must be moved more to achieve the same effect at low speeds, much like a steering wheel on a car must be turned more at low speeds to achieve a turn than at high speeds.

90.    MCAS was also designed to continue to move the stabilizer in up to 2.5-degree increments if the system detected a continued need to adjust the MAX's pitch downwards. This meant that MCAS could move the MAX's stabilizer by its full, 4.7-degree range of motion in just two movements.

91.    Because there are no excessive G-forces at low speed, engineers also removed the need to exceed specified G-forces prior to MCAS activation. Boeing also decided to change MCAS to rely on only one rather than both AOA sensors, and thus the removal of the G-force sensor safeguard left MCAS to be activated by a single AOA sensor. This change alarmed several Boeing employees who raised concerns with management about how vulnerable the new system was to a single point of failure, but Boeing ignored their concerns.[26]

### The Final, Grossly Negligent Design of MCAS

92.    The final version of MCAS had the power to apply maximum airplane nose-down pitch on the MAX in just two cycles if a single AOA sensor detected that the MAX was pointed into a dangerously steep climb. If the single AOA sensor supplying data to MCAS was damaged or supplied erroneous data, MCAS would force the MAX into a potentially catastrophic nose dive.

93.    Boeing's MCAS design was inexcusably deficient and grossly negligent in multiple respects. Its reliance on one AOA sensor as a single point of failure was highly

---

[26] H. Rep. Cmte. on Transportation and Infrastructure, *The Boeing 737 MAX Aircraft: Costs, Consequences, and Lessons from its Design, Development, and Certification.*

FILED DATE: 6/29/2020 4:53 PM   2020L006904

FILED DATE: 6/29/2020 4:53 PM    2020L006904

reckless.  At the time Boeing designed MCAS, Boeing was fully aware that AOA sensor failures and damage are common—and that, as a result, MCAS misfires were certain to occur.

94.    The AOA sensors, mounted on the left and right sides of the nose of the MAX, are intended to measure the angle between the airplane's fuselage (a line from the nose to the tail on the fuselage or the wing) and the oncoming airflow for purposes of detecting the risk of an aerodynamic stall.

95.    Boeing designed MCAS to take data from only one of the MAX's two AOA sensors per flight, and to alternate the sensor from which it accepts data after each flight.  But, as Boeing was aware, AOA sensors have failed or been damaged by airport gates, ground equipment, or other causes.  The FAA reported more than 50 AOA sensor failures in the past five years—nineteen of which were on Boeing aircraft, including prior versions of the 737—according to reports made to the FAA's Service Difficulty Reporting database.[27]

96.    Indeed, one FAA database reflects more than 1,172 instances since 1990 when birds—meadowlarks, geese, sandpipers, pelicans and turkey vultures, among others—damaged sensors of various kinds, with 122 strikes on AOA vanes.  Another FAA database shows 85 problems with angle-of-attack sensors on Boeing aircraft, including 38 on 737s since 1995. [28]

97.    Given that Boeing had racked up thousands of orders for MAX aircraft that would be flown for millions of flight hours, designing MCAS to rely solely on a single AOA sensor made it only a matter of time before MCAS activated erroneously due to sensor damage.

---

[27] Todd C. Frankel, *Not just the 737: Angle-of-attack sensors have had problems*, Herald Net (Mar. 18, 2019), https://www.heraldnet.com/nation-world/not-just-the-737-angle-of-attack-sensors-have-had-problems/.

[28] Jack Nicas, Natalie Kitroeff, David Gelles, and James Glanz, *Boeing Built Deadly Assumptions Into 737 Max, Blind to a Late Design Change*, New York Times (June 1, 2019), https://www.nytimes.com/2019/06/01/business/boeing-737-max-crash.html.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

98.     Since the MAX has two AOA sensors, Boeing could easily have designed MCAS to engage only if both sensors indicated the MAX was pitched dangerously upward.  But that would have created other problems.  Boeing knew that if the two sensors disagreed, MCAS would have no way to know which sensor was supplying erroneous data and would, therefore, need to be programmed to disengage.  Boeing could not allow MCAS to automatically disengage, because it knew that the MAX was not reliably flyable without it.  Boeing was also unwilling to make any changes to the MAX's design that might trigger heightened pilot training requirements, no matter how necessary they were to ensure the plane's safety.

99.     Thus, in the interest of rapidly getting the MAX to market, Boeing intentionally violated the cardinal rule of commercial aviation engineering—redundancy—and proceeded to manufacture and deliver an airplane with a critical system that had no redundancy and was effectively guaranteed to fail.

100.     So great was Boeing's haste to get the MAX to market that it did not even consult many of the employees who had developed the original MCAS about the changes it was now making.  Several of those engineers only learned about the system's augmented design after the MAX began to crash.  One engineer who helped design the original MCAS said "that's nuts" when learning of the modified system's lack of safeguards.[29]  Another, a safety analyst who scrutinized the early system, said "I'm shocked."[30]  A third engineer who assessed the system's sensors said "to me, it seems like somebody didn't understand what they were doing."[31]

---

[29]  Jack Nicas, Natalie Kitroeff, David Gelles, and James Glanz, *Boeing Build Deadly Assumptions Into 737 Max, Blind to a Late Design Change*, New York Times (June 1, 2019), https://www.nytimes.com/2019/06/01/business/boeing-737-max-crash.html.

[30] *Id.*

[31] *Id.*

26

FILED DATE: 6/29/2020 4:53 PM    2020L006904

101.    Boeing could also have addressed the obvious danger a faulty AOA posed by adding a third AOA sensor.  That way, the system could be programmed to continue operating as long as two of the three sensors supplied consistent data.  Boeing rejected this solution out of hand though, because, as reported by the *New York Times*, "former Max engineers, including one who worked on the sensors, said adding a third sensor to the Max was a nonstarter" since the "previous 737…had used two and managers wanted to limit changes."[32]

102.    Boeing's MCAS design was grossly negligent in other important respects as well.  Boeing's prior 737s were designed to allow the pilots to correct (and stop) improper stabilizer movements by moving the pilots' control columns (or yokes) in the direction opposite to the undesired stabilizer movement, similar to disengaging cruise control on a car by pressing the brake pedal.  On predecessor 737 models, this motion deactivates the automatic stabilizer trim system.  In those planes, the control column switching module moves the hydraulically powered elevators, which are movable control surfaces on the back edge of the horizontal stabilizer

103.    In the MAX, however, Boeing redesigned the control column switching modules to give MCAS "priority."  That meant that when pilots tried to disengage MCAS by pulling back on the yoke, the system—by Boeing's intentional design—did not disengage.  Pilots likely believed that pulling back on the yoke would trigger the Cutout (Stop) Stabilizer Trim functionality that was a known feature of predecessor 737s' SPEED TRIM system, but Boeing designed MCAS so that this standard system function did not work on the MAX.

104.    To make matters worse, Boeing gave MCAS the highest electrical stabilizer trim speed available, so that any MCAS system engagement would mean very abrupt nose down

---

[32] Jack Nicas and Julie Creswell, *Boeing's 737 MAX: 1960s Design, 1990s Computing Power and Paper Manuals*, New York Times (Apr. 8, 2019), https://www.nytimes.com/2019/04/08/business/boeing-737-max-.html.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

pitching of the airplane. The Stabilizer Trim System has three available speeds: (a) manual stabilizer trim wheel movement, which is slow; (b) flap up stabilizer speed, which is still slow but about 50% faster than manual; and (c) flap down stabilizer trim speed, which is about 50% faster than the flap up speed. MCAS was designed to move the stabilizer at the fastest possible speed, resulting in rapid nose-down pitching during an erroneous activation.

105. As Boeing's Chief Technical Pilot described in internal messages, MCAS was "running rampant" and "egregious" in simulator tests.[33] After noting that there were "already more nails than wood in the coffin," one employee who worked on the MAX wondered, "at this point, how can they consider continuing?"[34]

106. A MAX pilot can countermand an MCAS-commanded airplane nose down input by engaging yoke-mounted electric pitch trim switches to trim the nose back up, but unlike on the NG, Boeing designed the MAX such that the airplane's MCAS will automatically reset, reactivate, and push the nose down again when the pilot stops trimming the nose back up with these yoke electric trim switches.

107. The design decision by Boeing to have MCAS reset and reactivate after a pilot has countermanded an MCAS airplane nose down input created the danger that MCAS would fight against the efforts of pilots trying to save airplanes from being forced into nosedives by automated systems and crashing.

---

[33] Text Messages from Mark Forkener, Boeing 737 Chief Technical Pilot, to Patrik Gustavsson, Boeing 737 Technical Pilot (Nov. 16, 2016), available at https://www.documentcloud.org/documents/6497959-Boeing-Text-Messages.html (linked to Dominic Gates and Steve Miletich, *Stunning Messages from 2016 Deepen Boeing's 737 MAX Crisis*, Seattle Times (Oct. 18, 2019), https://www.seattletimes.com/business/boeing-aerospace/explosive-text-messages-reveal-boeing-knew-of-mcas-aggression-in-2016-and-misled-faa/).

[34] *See* internal emails and messages between Boeing employees, *supra* at 3.

FILED DATE: 6/29/2020 4:53 PM 2020L006904

108.    Below is an illustration of how MCAS forces the MAX into a dive based on erroneous AOA sensor data from a presentation by Europe's version of the FAA, the European Union Aviation Safety Agency ("EASA"), made to the European Parliament on September 3, 2019[35]:



109.    MCAS's design is so extreme that it will continue to command the electric trim to push the nose down even if the pilots are desperately pulling back on the airplane's yokes to pull the airplane's nose back up, because Boeing designed the system so that it would not disengage when pilots pulled back on their yokes.  And, critically, Boeing failed to tell airlines or pilots

---

[35] Patrick Ky, European Union Aviation Safety Agency, *Exchange of Views: European Union Aviation Safety Agency*, Presentation to the European Parliament at 10 (Sept. 3, 2019), https://www.europarl.europa.eu/cmsdata/186500/20190903_EASA_Ky-original.pdf.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

about this feature, resulting in cockpit crews being unable to diagnose the problem in emergency situations.

110.    MCAS will continue to command the electric stabilizer trim to push the nose down even if an airplane is dangerously low and at risk of crashing because Boeing designed the system so that it did not consider an airplane's altitude or proximity to terrain in its programing.

111.    Boeing also did not design and install in the MAX an automatic ground collision avoidance system, leaving the airplane without an automatic safeguard that would have protected it from MCAS-created emergencies that put the airplane in danger of crashing.

112.    Boeing also designed MCAS so that the system did not consider, and/or disregarded, the MAX's airspeed in deciding whether to automatically trim the airplane's nose down.  This design decision can cause MCAS to trim an airplane's nose down even when the airspeed indicates that the airplane is not at risk of stall and at airspeeds that make manual recovery of the airplane difficult or impossible.

113.    The only tool that a pilot has to counteract an erroneous MCAS activation is to cut power to the electric motors controlling much of the MAX's stabilizer trim system.  After disengaging the electric trim system, the pilots will have no electric assistance in moving the MAX's stabilizer.  They are left only with elevator control through the control yokes and the ability to move the stabilizer by manually cranking trim wheels in the cockpit that are physically connected to cables that pull the stabilizer.

114.    Relying on the manual stabilizer trim wheels to avert disaster is highly problematic.  In a dive situation, the aerodynamic force on the stabilizer is tremendous, and, having cut off power to the electric stabilizer trim motor that normally moves the stabilizer, pilots using the manual stabilizer trim wheels must overcome this force manually.  Doing so can

FILED DATE: 6/29/2020 4:53 PM    2020L006904

require more than 100 pounds of force—an extraordinary amount for many pilots, particularly where they must move the trim wheels with only one hand while holding the yoke in the other, and while secured into a four-point seat harness.

115.    As if this reliance on the manual stabilizer trim wheels was not bad enough, internal Boeing tests performed in early 2016 showed that if a pilot did not identify an erroneous MCAS activation and correct it by using the manual stabilizer trim wheels within seconds, the results would be a catastrophic, unrecoverable dive.[36]  Boeing CEO David Calhoun has admitted that Boeing made "a fatal mistake" in assuming that all pilots would be able to identify and rectify a failure by a system they did not know existed in such a short amount of time.[37]

116.    To make matters worse, when Boeing developed a simulator for the MAX, it used "dummy" trim wheels that lacked any mechanism for applying any real resistance to trim wheel movements.  These simulators did not simulate realistic conditions pilots in a MAX would face at all, and, instead, misled users as to actual flight conditions they would face.  In fact, Boeing knew or should have known that its procedures were grossly inadequate.

117.    Boeing knew that after an MCAS-commanded nose down emergency the aerodynamic forces on the horizontal stabilizer could be too great for pilots to control manually without the use of the electric stabilizer trim motor.[38]

---

[36] H. Rep. Cmte. on Transportation and Infrastructure, *The Boeing 737 MAX Aircraft: Costs, Consequences, and Lessons from its Design, Development, and Certification* (quoting Boeing Coordination Sheet, Revision D, 3/30/16 TBC-T&I 29160 – TBC-T&I 29166 at TBC-T&I 29166).

[37] Kitreoff and Gelles, *Boeing's New C.E.O. Confronts Its Challenges*.

[38] *See* H. Rep. Cmte. on Transportation and Infrastructure, *The Boeing 737 MAX Aircraft*; *see also* Andy Pasztor and Andrew Tangel, *Boeing's Latest 737 MAX Concern: Pilot's Physical Strength*, Wall Street Journal (June 19, 2019), https://www.wsj.com/articles/physical-strength-of-pilots-emerges-as-issue-in-returning-737-max-to-flight-11560937879.

FILED DATE: 6/29/2020 4:53 PM   2020L006904

118.    Boeing also recognized that many "younger pilots" and pilots who had become "reliant on automation" would not be able to apply "proper trim technique" on the MAX. These are the types of issues that can be addressed in simulator training, but Boeing refused to consider it because of their singular focus on making their product easier to sell and faster to push through the regulatory process, even at the expense of safety.

119.    Boeing also knowingly failed to conduct a proper failure modes and effect analysis during development of the MAX to ensure that the airplane's MCAS was safe.

120.    In particular, Boeing failed to properly consider the likelihood that a single MAX AOA sensor may fail and mistakenly trigger MCAS to push the MAX into a dive toward the ground. John Hamilton, Boeing Commercial Airplanes' chief engineer, under questioning from Congress in October 2019, admitted that this decision was wrong.

121.    Boeing did not sufficiently test the MAX's MCAS during development to ensure that the automated system would not create a flight safety problem if the flight control computer in command during that flight were to receive erroneous data from its AOA sensor.

122.    As the National Transportation Safety Board ("NTSB") determined, Boeing also failed to consider the effects of pilots being bombarded by multiple "stick shaker" and other warnings simultaneously in the event of an MCAS misfire. As the NTSB noted in its report, "neither Boeing's system safety assessment nor its simulator tests evaluated how the combined effect of alerts and indications might impact pilots' recognition of which procedure(s) to prioritize in responding to an unintended MCAS operation caused by an erroneous AOA input,"

FILED DATE: 6/29/2020 4:53 PM   2020L006904

even though "industry experts generally recognize that an aircraft system should be designed such that the consequences of any human error are limited."[39]

123.    Adam Dickson, a former Boeing engineer who led a team of engineers who worked on the MAX, stated, "My family won't fly on a 737 MAX. It's frightening to see such a major incident because of a system that didn't function properly or accurately."[40]

124.    In Boeing's rush to get the MAX to market, Boeing knowingly compromised the safety of the MAX.

### Boeing Misleads the FAA and Customers about the Dangers of MCAS

125.    In addition to designing the MAX, Boeing also played a significant role in obtaining FAA approval and certification for it.

126.    Boeing knew that it would be highly unlikely to win expedited FAA certification for the MAX if the FAA understood the true nature of the MAX's nose-up tendency and the deficiencies in the MCAS solution that Boeing was relying on to fix that problem. To avoid delay, Boeing decided to conceal that information from the FAA.

127.    Boeing took advantage of the FAA's delegation program, which allowed Boeing to handle certain certification tasks itself. One of the critical elements of the FAA safety evaluation process is the System Safety Analysis ("SSA"), which assesses the frequency and severity of potential hazards. In 2015, when Boeing was at least nine months behind Airbus's

---

[39] Nat'l Transp. Safety Bd., ASR-19-01, *Safety Recommendation Report: Assumptions Used in Safety Assessment Process and the Effects of Multiple Alerts and Indications on Pilot Performance* (2019), https://www.ntsb.gov/investigations/AccidentReports/Reports/ASR1901.pdf.

[40] Dominic Gates, Steve Miletich, and Lewis Kamb, *Boeing pushed FAA to relax 737 MAX certification requirements for crew alerts*, Seattle Times, Oct. 2, 2019, https://www.seattletimes.com/business/boeing-aerospace/boeing-pushed-faa-to-arelax-737-max-certification-requirements-for-crew-alerts/.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

A320neo in the design and certification process, Boeing persuaded the FAA to allow it to perform the SSA for the early version of MCAS, rather than having the system assessed by the FAA itself.

128.    Boeing engineers authorized to work on behalf of the FAA as FAA delegates developed this SSA for MCAS, a document which, in turn, was shared with foreign air safety regulators in Europe, Canada, and elsewhere around the world.  The SSA, however, had several critical flaws and was not updated following the dramatic changes Boeing made to MCAS in 2016.

129.    Boeing's SSA for MCAS stated that MCAS could swivel the horizontal stabilizer by no more than 0.6 degrees—the original limit for MCAS.  Boeing never updated the SSA after it modified MCAS to quadruple its power and allow it to swivel the stabilizer by 2.5 degrees, despite the fact that safety analyses are required to be updated to reflect the most accurate aircraft information following test flights.  As one former FAA engineer involved in testing the MAX stated, "the numbers [in the SSA] should match whatever design was tested and fielded."[41]  Due to this omission, engineers at the FAA incorrectly believed that MCAS was designed with a 0.6-degree limit.

130.    The SSA that Boeing prepared also failed to account for how the system could reset itself each time a pilot responded, thereby missing the system's potential to repeatedly push the airplane's nose downward.  Because the 2.5-degree limit applies *each time* MCAS is triggered and it can be triggered multiple times, MCAS actually has the ability to move the

---

[41] Dominic Gates, *Flawed Analysis, Failed Oversight: How Boeing, FAA Certified the Suspect 737 MAX Flight Control System*, Seattle Times (Mar. 21, 2019, 9:46 AM), https://www.seattletimes.com/business/boeing-aerospace/failed-certification-faa-missed-safety-issues-in-the-737-max-system-implicated-in-the-lion-air-crash/.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

stabilizer up to 4.7 degrees—the maximum the stabilizer can be swiveled and nearly *eight times* what Boeing's SSA reported to the FAA.

131.    MCAS's ability to reset compounded its power to send the MAX into an unrecoverable dive.  As Peter Lemme, a former Boeing engineer who worked on the MAX's flight controls, put it, MCAS "effectively has unlimited authority…. There was no need for that. Nobody should have agreed to give it unlimited authority."[42]   Boeing should never have designed MCAS in this fashion, without disclosing this aspect of MCAS's design to the FAA.

132.    The SSA was also flawed in the way it assessed a potential failure of MCAS.  As explained above, MCAS relied on only one sensor system—the AOA sensor—to determine whether to activate.  Whether a system on a jet can rely on one sensor input, or must have two, is driven by the SSA's failure classification system.  Much of the equipment on a commercial airplane is reliable enough to meet the "major failure" requirement, meaning that its failure could cause physical distress, but not death, to people on the plane, and that the probability of a failure is less than one in 100,000.  Such systems are, therefore, typically allowed to rely on a single input sensor.

133.    When the consequences of a failure are assessed to be more severe—either "hazardous failures," which could cause serious or fatal injuries to a small number of passengers, or "catastrophic failures," which could cause the loss of the plane and multiple fatalities—a system must have multiple input channels in case one goes wrong.

134.    Boeing's SSA assessed an MCAS failure as either a "major failure" or, in rare cases where the plane is in an extreme maneuver, a "hazardous failure."  Boeing knew or should have known that an MCAS failure was more serious and should have been classified as

---

[42] *Id.*

FILED DATE: 6/29/2020 4:53 PM    2020L006904

catastrophic.  Boeing also should have included the necessary checks and redundancies, and its failure to do so was erroneous and dangerous.

135.    MCAS did not meet the requirements for a system with a hazardous failure rating, as the tragic Lion Air and Ethiopian Airlines crashes show. As one FAA engineer stated, "the assumptions in [the SSA] are incorrect.  The human factors were not properly evaluated."[43]

136.    As noted above, Boeing did not tell its customers, or pilots transitioning to the MAX, that it had incorporated MCAS into the airplane, or that MCAS would automatically force the airplane's nose toward the ground if the AOA sensor supplying data for that flight erroneously "told" the system that the nose of the airplane was angled too high.

137.    Boeing recklessly decided that its customer airlines and MAX pilots did not need to know about MCAS since MCAS was supposed to be an automatic system that required no pilot input to operate.

138.    Moreover, despite knowing that some pilots would need more training to operate the MAX safely, Boeing decided that NG pilots did not need to be trained in a simulator and/or in the airplane, and, in particular, did not need simulator training or testing on how to handle emergencies caused by the airplane's MCAS or an MCAS failure.  Not only were pilots not trained on how to respond to an MCAS misfire, but they were also left in the dark about the system even existing.

139.    Boeing was so determined to keep customers and pilots from knowing about MCAS that it took active steps to remove MCAS from the MAX's flight crew operations manual.

---

[43] *Id.*

FILED DATE: 6/29/2020 4:53 PM    2020L006904

140.    On March 30, 2016, Boeing employee Mark Forkner, the MAX's chief technical pilot, sent an email to senior FAA officials requesting to remove MCAS from the pilot's manual. The FAA officials who helped determine piloting needs had been briefed months earlier on the original version of MCAS.  However, neither Mr. Forkner nor Boeing ever mentioned to these FAA officials that MCAS was in the midst of an overhaul.  Rather, because Boeing presented MCAS as a benign and rarely used system, the FAA approved Boeing's request.

141.    Mr. Forkner has since invoked his Fifth Amendment rights to resist producing documents pursuant to a grand jury subpoena.

142.    Boeing also went to extraordinary lengths to deceive regulators into accepting their plan not to require additional pilot training.  Mr. Forkner described how he had to "jedi mind trick [the regulators] that there is enough commonality with the [MAX] and the [NG]" and "lied to the regulators" in order to achieve needed FAA approvals for the MAX.[44]

143.    Boeing knew exactly what it was doing.  Speaking of the need to convince regulators that "there isn't a difference between what [pilots are] trained for on the NG and the MAX," Forkner added "I know it sounds hokie [*sic*], but that is the game we have to play with the regulators."[45]  He was even clearer in a March 2017 email, asserting that "I want to stress the importance of holding firm that there will not be any type of simulator training required to transition from NG to MAX.  Boeing will not allow that to happen.  We'll go face to face with any regulator who tries to make that a requirement."[46]

---

[44] Text Messages from Mark Forkener, Boeing 737 Chief Technical Pilot, to Patrik Gustavsson, Boeing 737 Technical Pilot (Nov. 16, 2016), available at https://www.documentcloud.org/documents/6497959-Boeing-Text-Messages.html.

[45] See emails and internal messages between Boeing employees, *supra* at 3.

[46] *Id.*

FILED DATE: 6/29/2020 4:53 PM    2020L006904

144.    Boeing was remarkably candid and cavalier internally about what it was doing.  It made clear that if an employee's actions led to a regulator "requir[ing] sim training," they would "get crucified," with one employee writing "I'll be shocked if the FAA passes this turd."[47] Employees got the message.  As one conceded in a 2018 internal Boeing message, "I have used the words 'misleading' and 'mischaracterization' a lot over the last two years in relation to [t]his program."[48]  Another wrote "I still haven't been forgiven by god for all the covering up I did last year."[49]

145.    Boeing made each of these decisions to facilitate sales of the MAX, regardless and in spite of safety concerns for one reason:  so that Boeing could continue to tell its customers that MAX pilots could fly revenue-generating routes as quickly as possible without airlines incurring training costs, which meant that Boeing could sell more MAX planes.

**Boeing Fails to Include Critical Safety Features for MCAS in Standard Configurations**

146.    Safety should never be optional in the design, manufacture, and sale of a commercial airplane.  Boeing maintains that: "[s]afety is the primary consideration when Boeing engineers design an airplane.  In addition to meeting regulatory requirements before certification, each airplane model must meet Boeing's time-proven design standards.  Often these standards are more stringent than regulatory requirements."[50]  However, Boeing's acts and omissions detailed throughout this complaint demonstrate that profits, rather than safety, were Boeing's primary concern.

---

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Aviation Safety*, Boeing, https://www.boeing.com/company/about-bca/aviation-safety.page (last visited June 27, 2020).

FILED DATE: 6/29/2020 4:53 PM   2020L006904

147.    Boeing put its business interests ahead of safety in its design, manufacture, and marketing of the MAX airplane when it decided to charge its customers extra for the installation of important safety features.

148.    In marketing the MAX airplane to potential owners and operators, including Norwegian, Boeing offered a number of optional, for-purchase, safety upgrades.

149.    One of those upgrades, the Angle of Attack Indicator ("AOA Indicator"), if purchased and installed, would instantly display to the pilots the real-time data from both AOA sensors, providing valuable safety information to the pilots.

150.    The information provided by the AOA Indicator, if purchased and installed, would assist pilots in diagnosing why a MAX's MCAS was erroneously pushing the airplane down toward the ground—had they been told MCAS existed.  It would also alert pilots and airlines to problems with AOA sensors, which could enable them to replace damaged AOA sensors before the damage led to an erroneous MCAS activation.

151.    Boeing did not offer the AOA Indicator as standard equipment in the MAX because it wanted to be able to offer the base airplane at a low price point in order to make it more competitive, while, at the same time profiting on the sale of an optional safety feature from the airlines that ordered it.

152.    Boeing has admitted that the AOA Indicator feature would have helped prevent the types of crashes that occurred on Lion Air and Ethiopian Airlines.

153.    On November 27, 2018—approximately one month after the Lion Air tragedy—Boeing executive Mike Sinnett told American Airlines' pilot union that their pilots would not

experience the MCAS problems that doomed the Lion Air flight, according to Dan Carey, union president, because American had paid extra for Boeing's AOA Indicator feature.[51]

154.    Another feature that should have been standard on the MAX and would also have helped prevent crashes was the AOA sensor disagree alert ("Disagree Alert"). This feature, which had been standard on prior 737s—and which was supposed to be standard on the MAX— alerted pilots and operators when the aircraft's two AOA sensors were not generating the same information.

155.    Unfortunately, the AOA Disagree Alert was also omitted as a standard feature in the MAX. This omission was a violation of FAA regulations, according to FAA Deputy Administrator Daniel Elwell.[52]

156.    To make matters worse, Boeing knew the AOA Disagree Alert had been omitted as a standard feature on the MAX for nearly a year, but did not tell customers who believed it was standard—as it had been on the NG—nor did they tell the FAA about the issue.

157.    A preliminary investigative findings report by the U.S. House of Representatives Committee on Transportation and Infrastructure found that "**Boeing knowingly delivered 737 MAX aircraft to its customers that did not conform to the airplane's type certificate**," due to the failure to include a working AOA Disagree Alert.[53]

158.    As early as 2017, Boeing engineers learned that the Disagree Alert only functioned if customers purchased the AOA Indicator, because the Disagree Alert had been

---

[51] Andy Pasztor, Andrew Tangel, Robert Wall, and Alison Sider, *How Boeing's 737 MAX Failed*, Wall Street Journal, Mar. 27, 2019, https://www.wsj.com/articles/how-boeings-737-max-failed-11553699239.

[52] H. Rep. Cmte. on Transportation and Infrastructure, *The Boeing 737 MAX Aircraft: Costs, Consequences, and Lessons from its Design, Development, and Certification*.

[53] *Id.*

FILED DATE: 6/29/2020 4:53 PM    2020L006904

erroneously linked to the AOA Indicator feature option on the MDS – Max Display System. The Disagree Alert was supposed to be a standard safety feature.

159.    Instead of alerting customers and correcting the issue upon discovering that the Disagree Alert was not working, Boeing concealed the issue from the FAA and from customers and did not correct it. Prior to being fired, Boeing's former CEO, Dennis Muilenburg, unequivocally admitted that "[Boeing] clearly had a mistake in the implementation of the [Disagree Alert]" and had provided "inconsistent" communications with regulators and customers about the issue, which he acknowledged was "unacceptable."[54]

160.    Boeing's spokesperson, Gordon Johndroe, echoed these sentiments at the 2019 Paris Air Show, stating that "[Boeing] clearly fell short in the implementation of the AOA disagree alert and we clearly should have communicated better with our regulators and the airlines."[55]

161.    Even if purchased, the optional AOA Indicator and Disagree Alert alone are insufficient for pilots to diagnose pitch control issues, such as why the nose of the aircraft continues to pitch down, and are thus insufficient on their own to prevent an accident triggered by MCAS.

**The Tragic Crash of Lion Air Flight 610**

162.    On October 28, 2018, a new MAX aircraft, flying as Lion Air Flight 610, ("JT610") crashed into the Java Sea shortly after takeoff from Jakarta, Indonesia.

---

[54] Natalie Kitreoff, *Handling of 737 Max Warning Light Was a 'Mistake,' Boeing C.E.O. Says*, New York Times (June 16, 2019), https://www.nytimes.com/2019/06/16/business/boeing-737-max.html.

[55] Daniella Cheslow, *Boeing CEO Admits Mistake in 737 Max Communication*, NPR (June 16, 2019, 2:54 PM), https://www.npr.org/2019/06/16/733215857/boeing-ceo-admits-mistake-in-737-max-communication.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

163.    JT610 took off at 6:20 a.m. local time in Jakarta.

164.    Shortly after takeoff, the captain's stall warning system (stick shaker) activated and the airplane's MCAS suddenly pushed the nose of the airplane down for ten seconds.

165.    JT610's left AOA sensor had failed and sent erroneous data to the airplane's flight control computer, causing the captain's "stick shaker" stall warning system to go off and the MCAS to activate and trim the airplane's nose down.

166.    JT610's flight crew responded by raising the nose using the airplane's electric trim system, but as soon as the crew finished doing so, MCAS reactivated and again forced the airplane's nose down.

167.    JT610's flight crew fought against MCAS for the remainder of the flight, while attempting to return the airplane to Jakarta for an emergency landing. MCAS activated erroneously *26 separate times* over the course of approximately six minutes of flight, causing a harrowing series of more than two dozen climbs and dives all while the IAS DISAGREE, ALT DISAGREE, and FEEL DIFF PRESS alerts were going off and the EGPWS was intoning altitude alerts, "AIR SPEED LOW AIR SPEED LOW," "TERRAIN-TERRAIN," and "SINK RATE."  The cockpit voice recorder shows the flight crew's struggle to figure out which alert was causing the issue as the pilots ran through memory items, the Airspeed Unreliable checklist, and fixes for the feel differential pressure alert.

168.    Approximately eleven minutes after takeoff, JT610 crashed into the Java Sea, killing all 189 people on board.

169.    The inability of JT610's flight crew to recover from the MCAS-created emergency demonstrated that the MAX violated the FAA's Airworthiness Standards for Commercial Aircraft, which states that airplanes must be safely controllable and maneuverable

42

FILED DATE: 6/29/2020 4:53 PM    2020L006904

during all phases of flight and that it must be possible to make safe and smooth transitions from one flight condition to another without exceptional piloting skill, alertness, or strength.[56]

170.    Investigators quickly discovered that JT610's left AOA sensor had sent erroneous data to MCAS, which responded by repeatedly forcing the airplane into a downward dive.

171.    Investigators also learned that Boeing had designed MCAS to reset each time pilots pulled the airplane's nose up to countermand an improper MCAS activation—and that, as a result, MCAS had repeatedly forced the airplane's nose back down in a cycle that repeated itself relentlessly until the pilots eventually lost control of the plane.

172.    As noted above, this occurred because Boeing had designed MCAS to continuously force the nose of a MAX back down, even after being raised by the pilots, so long as the system continued to receive erroneous data from the airplane's AOA sensor.

173.    Investigators found that JT610's pilots fought a terrifying eleven-minute battle against MCAS for control of the airplane before the crash.

174.    Because Boeing had not provided Lion Air or its pilots with information related to MCAS, the JT610 pilots never knew why the plane's nose was repeatedly forced down.  Their first experience with MCAS was in the terrifying minutes before JT610 crashed.  Boeing's recklessness in the design of MCAS, and its failure to tell pilots how the system functioned, left the cockpit crew with no way to steer the plane to safety.

175.    Boeing placed its own business interests ahead of aviation safety by continuing to represent to the FAA, its customers, and the public that the MAX was safe to fly, even after the Lion Air JT610 disaster.

---

[56] 14 C.F.R. § 25.143(b).

FILED DATE: 6/29/2020 4:53 PM    2020L006904

**Boeing's Grossly Inadequate Reaction to the Lion Air Crash**

176. Once JT610 crashed, Boeing knew beyond question that its MCAS design was defective and dangerous. Despite that knowledge, Boeing did not make any changes to the plane and continued delivering it to customers with the defective and dangerous MCAS software installed. Instead, Boeing pursued plans to increase its MAX production rate from 52 to 57 aircraft per month.

177. On November 7, 2018, Boeing published an update to its operators' airplane flight manuals ("AFMs") which, for the first time, provided flight crews with information on MCAS and the procedures Boeing recommended for dealing with an MCAS malfunction. Pilots were told to deactivate MCAS by switching off the plane's "STAB TRIM CUTOFF" switches and then to manually turn the stabilizer trim wheels located next to the pilots' seats to physically raise the nose of the airplane. According to expert accounts, pilots would have mere seconds to take these steps before an MCAS-triggered dive might become unrecoverable. Pilots would also need the requisite physical strength to manually move the stabilizer. If a pilot happened to be in a restroom, momentarily distracted, or physically unable to apply 100 pounds of pressure with one hand, an erroneous MCAS activation could doom the flight. Yet, Boeing continued manufacturing and delivering MAXs at a historic rate.

178. Boeing claimed that an erroneous MCAS activation was akin to a "Runaway Stabilizer" and could be handled by employing existing flight crew procedures without changes to "memory procedures"—the procedures pilots are required to memorize—but pilots and aviation experts disagree and note that an MCAS failure differs from a runaway stabilizer in important ways.

44

FILED DATE: 6/29/2020 4:53 PM    2020L006904

179.    First, with a runaway stabilizer, there is continuous, uncommanded movement of the horizontal tail.  In contrast, the movement of the tail is not continuous in an MCAS failure: pilots are able to counteract the nose-down movement MCAS causes, only to have MCAS move the tail once again.  Second, MCAS alters the control column response to the stabilizer movement.  Pulling back on the control column normally interrupts any stabilizer airplane nose-down movement, but in an MCAS failure, that control column function is disabled.

180.    The same day Boeing updated its AFMs, November 7, 2018, the FAA issued an Emergency Airworthiness Directive (AD 2018-23-51) requiring the operators of Boeing's MAX aircraft to incorporate Boeing's update into their respective AFMs within 30 days.

181.    In its emergency directive, the FAA described an "urgent safety of flight situation" caused by an "unsafe condition" in the MAX:  "if an erroneously high single angle of attack (AOA) sensor input is received by the flight control system, there is a potential for repeated nose-down trim commands of the horizontal stabilizer.  This condition, if not addressed, could cause the flight crew to have difficulty controlling the airplane, and lead to excessive nose-down attitude, significant altitude loss, and possible impact with terrain."[57]

182.    Thus, as early as November 2018, Boeing knew and accepted that MCAS was defective and was working on a software fix to address its defects, while, at the same time, misrepresenting to the public, the FAA, and its customers that the MAX was safe to fly. Boeing's knowledge, coupled with its inaction in the face of that knowledge, demonstrated Boeing's reckless indifference and conscious disregard for the flying public and constituted misrepresentations to Boeing's customers, including Norwegian.

---

[57] Federal Aviation Administration, Emergency Airworthiness Directive AD 2018-23-51 (Nov. 7, 2018), https://rgl.faa.gov/Regulatory_and_Guidance_Library/rgad.nsf/0/83ec7f95f3e5bfbd8625833e007 0a070/$FILE/2018-23-51_Emergency.pdf.

FILED DATE: 6/29/2020 4:53 PM      2020L006904

183.    In fact, Boeing knew by this time that the defects in MCAS were so severe that another crash was likely in a matter of just months, which is exactly what occurred.  Despite this knowledge, Boeing continued to manufacture and sell defective MAX aircraft, all the while falsely insisting that they were safe, when Boeing knew that its assertion was a lie.

184.    In the days immediately following the Lion Air crash, the FAA—which had finally learned the true details about MCAS's design that Boeing had concealed from it—conducted an analysis known as a Transport Airplane Risk Assessment Methodology, or TARAM.

185.    The TARAM is based on a spreadsheet with formulas that consider data inputs such as fleet size, probability that sensors will fail, and passenger counts—information which had been readily available to Boeing throughout the design process—and aims to predict, among other things, the number of deaths that could occur as a result of a hazardous condition.

186.    The TARAM analysis confirmed the fact that it "didn't take that much" for an MCAS malfunction similar to what occurred on the Lion Air flight to occur on another MAX aircraft, and that another accident was likely to occur within months.[58]

187.    In fact, the TARAM analysis predicted that MCAS would lead to fifteen catastrophic crashes in the MAX's lifetime—*more than all fatal passenger accidents, regardless of reason, on all Boeing commercial aircraft models combined over the past 30 years*.

188.    The FAA shared this information with Boeing, which did not disclose this potential for catastrophic crashes to the general public or to its customers.  Nor did Boeing take any steps to alleviate those risks.  In fact, Boeing—again placing profits over safety—internally

---

[58] Andrew Tangel and Andy Pasztor, *Regulators Found High Risk of Emergency After First Boeing MAX Crash*, Wall Street Journal (July 31, 2019), https://www.wsj.com/articles/regulators-found-high-risk-of-emergency-after-first-boeing-max-crash-11564565521.

FILED DATE: 6/29/2020 4:53 PM 2020L006904

dismissed the risk of a catastrophic crash every one to two years as being "sufficiently low to allow continued growth of the [MAX] fleet."[59]

189.    Boeing's response was to downplay the significance of the threat presented by MCAS, agree to alert pilots to MCAS's existence, and otherwise to continue manufacturing MAX aircraft without any changes to its design. Boeing did begin work on developing solutions to its flawed MCAS, but, after more than a year-and-a-half of round-the-clock efforts from one of the world's biggest companies, Boeing has been unable to arrive at a workable solution—a testament to the seriousness of the MAX's flaws.

190.    Boeing failed to call for any aggressive action to prevent further incidents in response to the Lion Air crash, because it was focused on selling more airplanes quickly and maximizing profits. Boeing also failed to inform customers, such as Norwegian, of the significant threat that MCAS presented. To the contrary, Boeing pushed to ramp up production and deliveries, delivering five additional MAXs worth hundreds of millions of dollars to Norwegian between the Lion Air crash and the subsequent grounding of the MAX.

191.    Boeing's failure to provide sufficient documentation regarding the highly complex systems that differentiate the MAX from previous models precluded and prevented Norwegian from making an informed decision regarding its purchase of the MAX aircraft, and also increased the risk (and the reality) of future accidents. Boeing compounded this issue by continuing to provide inaccurate and misleading information to Norwegian about the claimed similarities between NG and MAX flight procedures following the Lion Air crash.

---

[59] Andy Pasztor and Andrew Tangel, *Internal FAA Review Saw High Risk of 737 MAX Crashes*, Wall Street Journal, Dec. 11, 2019, https://www.wsj.com/articles/internal-faa-review-saw-high-risk-of-737-max-crashes-11576069202?mod=hp_lead_pos1.

192. Boeing chose not to respond to the Lion Air crash with the appropriate degree of urgency or with appropriate safety steps, and to again prioritize its own profits over passenger safety and its customers' operations. Boeing feared that taking further steps would result in financial detriment to itself if airlines grounded their aircraft, cancelled orders for more aircraft, or had to retrain their pilots. Again, motivated by its own economic interests, Boeing continued to deliver MAX airplanes while assuring its customers, the FAA, and the public that the airplane was safe to fly, thereby creating a false sense of security. This charade continued until another tragedy occurred.

**The Ethiopian Airlines Flight 302 Air Crash Disaster**

193. On March 10, 2019, another almost brand new MAX aircraft, flying as Ethiopian Airlines flight ET302, took off from Addis Ababa containing the same MCAS defects as the airplane used by Lion Air to operate JT610.

194. Within one minute after takeoff, ET302's left AOA sensor recorded erroneous values and its left stall warning system activated and remained active until near the flight's tragic end.

195. ET302's flight data recorder later revealed that shortly after takeoff, the airplane's left AOA sensor data suddenly deviated significantly from the right AOA sensor data; the left AOA sensor data reached a maximum value of 74.5 degrees nose up, an erroneous and exceedingly implausible angle for a commercial plane, while the right AOA sensor data reached a maximum value of 15.3 degrees.

196. ET302 also experienced airspeed, altitude, and flight director pitch bar values on its left side that deviated from the airplane's right-side values, with the left side values measuring notably lower than the right-side values.

48

FILED DATE: 6/29/2020 4:53 PM    2020L006904

FILED DATE: 6/29/2020 4:53 PM    2020L006904

197.    The erroneous and implausible data transmitted by ET302's left AOA sensor indicated to the airplane's flawed MCAS that the plane was at an extreme nose high attitude and at risk of stalling, triggering the airplane's left stall warning system to activate.

198.    The erroneous data from ET302's left AOA sensor also caused the airplane's MCAS to activate and command automatic nose down trim inputs and triggered a barrage of confusing alerts in ET302's cockpit.  The pilot's stick shaker was physically vibrating to warn of a stall, while a master caution light illuminated to indicate system faults, while other alerts for altitude and air speed warnings illuminated as well.  At the same time, the Ground Proximity Warning System began to provide the audio alert "DON'T SINK" in the cockpit.  None of the alerts were correct other than the Ground Proximity Warning System; the rest were caused by the erroneous AOA sensor.

199.    Despite the barrage of erroneous alerts, ET302's flight crew followed Boeing's recommended procedures: the airplane's cockpit voice recorder has the first officer calling out "stab trim cut-out" twice after MCAS dove the airplane down toward the ground, followed by the captain's concurrence, indicating that the pilots shut off the electric trim.

200.    ET302's flight crew, however, found it impossible to manually control the forces on the airplane's yoke.

201.    Despite both pilots desperately pulling back on the yoke and attempting to manually trim the airplane's nose up together, they could not pull the airplane out of the MCAS-commanded dive.

202.    Shortly before the crash, ET302's desperate pilots reengaged the electric trim and began trimming the airplane's nose back up, but MCAS again activated and pushed the nose down.

203.    At 8:44 AM local time (5:44 AM UTC)—six minutes after takeoff—ET302 disappeared from radar and crashed into the ground near the town of Bishoftu, Ethiopia, approximately 28 miles southeast of Addis Ababa Bole International Airport, destroying the airplane and killing all 157 people on board.

204.    The Ethiopian Airlines disaster demonstrated that Boeing had not properly responded to the Lion Air disaster and that the MAX remained flawed and unsafe.

205.    The disaster also confirmed that the MAX violated the FAA Airworthiness Standards for Commercial Aircraft, which require that airplanes be safely controllable and maneuverable during all phases of flight and that it must be possible to make safe and smooth transitions from one flight condition to another without exceptional piloting skill, alertness, or strength.

206.    Boeing's then-CEO Dennis Muilenburg acknowledged shortly after the Ethiopian Airlines crash that the two accidents were caused by a chain of events "with a common chain link being erroneous activation of the aircraft's MCAS function."[60]   He later added that the erroneous alerts in the cockpit in both doomed flights "created more workload for the pilots in what was already a high workload environment."[61]   Yet, even after the Ethiopian Airlines tragedy, Boeing continued to manufacture and sell MAX aircraft and insist that the MAX was safe as designed.

---

[60] *Statement from Boeing CEO Dennis Muilenburg: We Own Safety – 737 MAX Software, Production and Process Update*, Boeing (Apr. 5, 2019), https://investors.boeing.com/investors/investor-news/press-release-details/2019/Statement-from-Boeing-CEO-Dennis-Muilenburg-We-Own-Safety---737-MAX-Software-Production-and-Process-Update/default.aspx.

[61] Alexis Keenan, *Boeing CEO: Preliminary Investigations Show 737 MAX Pilots Exposed to 'High Workload Environment'*, Yahoo Finance (Oct. 2, 2019), https://finance.yahoo.com/news/dennis-muilenburg-boeing-737-crashes-002622906.html.

50

FILED DATE: 6/29/2020 4:53 PM   2020L006904

**The Worldwide Grounding of the MAX**

207.    The crashes of Lion Air Flight 610 and Ethiopian Airlines Flight 302 demonstrated what Boeing had long known: that the MAX was unsafe, violated the FAA's Airworthiness Standards for Commercial Aircraft, and should not be flown until its design flaws could be fixed, or its design could be significantly overhauled.

208.    Neither of these options, however, was palatable to Boeing because they threatened future deliveries of the MAX to Boeing's customers who had already purchased the planes.  Despite strong pressure on global regulators to ground the MAX following the Ethiopian Airlines crash, Boeing and its lobbyists did their best to persuade regulators that a grounding was not needed.

209.    Boeing did not succeed.  Between March 11 and March 13, 2019, aviation regulators around the world ordered MAX aircraft under their jurisdictions grounded and banned MAX aircraft from flying in their airspace.

210.    The EASA, which Norway follows, grounded the MAX on March 12, 2019.

211.    Norwegian grounded its MAX fleet on March 12, 2019 as well.

212.    In the U.S., where the FAA was one of the last regulatory authorities to ground the MAX, due, in part, to Boeing's litany of (false) assurances of the plane's safety, many American passengers refused to board MAX airplanes because of safety concerns.  The FAA ordered all MAX aircraft in U.S. airspace grounded on March 13, 2019.

213.    On April 5, 2019, Boeing's then-CEO issued a statement acknowledging that the crashes of JT610 and ET302 were caused by MCAS and admitted that "[w]e have the

FILED DATE: 6/29/2020 4:53 PM    2020L006904

responsibility to eliminate this risk, and we know how to do it." Boeing released a press release admitting that "safety is our responsibility, and we own it."[62]

### Boeing Fails to Correct Defects in a Timely Manner, Damaging Norwegian

214.    Since October 2018, Boeing has been working on an apparent MCAS software fix for the MAX. The software fix reportedly includes:

a.    MCAS AOA Sensor Enhancements – The flight control system will now compare inputs from both AOA sensors. If the sensors disagree by 5.5 degrees or more with the flaps up, MCAS will not activate and the Disagree Alert will alert the pilots to the discrepancy;

b.    MCAS Activation Enhancements – if MCAS is activated in abnormal conditions, it will only activate once for each elevated AOA event; and

c.    MCAS Command Limit – MCAS can never command more stabilizer input than can be counteracted by the flight crew pulling back on the column. The pilots will always have the ability to override MCAS and manually control the airplane.

215.    Despite having been working on a fix for over fifteen months, Boeing has yet to deploy a fix that satisfies regulators and fixes the defective aircraft already delivered to customers like Norwegian. Indeed, Boeing has missed every deadline that it has set for itself on this project. And the FAA has reprimanded Boeing for setting unrealistic deadlines in an attempt to pressure the FAA into recertifying the MAX.

216.    On March 20, 2019, Boeing said that it would have a software update ready by March 29, 2019.

---

[62] Boeing, *We Own Safety*, *supra* at 50.

FILED DATE: 6/29/2020 4:53 PM   2020L006904

217.    On April 1, 2019, Boeing stated that it needed more time to complete the software fix due to an issue with integrating the software fix with the plane's existing hardware.

218.    On June 26, 2019, Norwegian learned that not only was a fix not ready, but that Boeing and the FAA had discovered yet another flight-control problem on the MAX, involving the failure of a microprocessor in the plane's flight control system.

219.    Boeing revised its estimate for when the MAX would be fixed to August 2019, then September 2019, then early in the fourth quarter of 2019, then late in the fourth quarter of 2019, then early December 2019, and finally any time before the end of 2019.  None of these projections proved accurate.

220.    Boeing's latest predictions are that the MAX will not be recertified until summer 2020 or later, well over a year after the initial grounding.

**Boeing Fires its CEO and Shuts Down the MAX Production Line**

221.    In December 2019, Boeing fired its CEO, Dennis Muilenburg, replacing him with its board chairman.  Prior to being fired, Muilenburg had testified before Congress that Boeing made "mistakes" in designing the MAX, and that if he could go back in time, Boeing would have grounded the MAX immediately after the Lion Air crash in 2018 in order to "save lives."[63]

222.    Boeing's new CEO has criticized Muilenburg for racing to get stock prices up at the risk of quality, stating that "[i]f anybody ran over the rainbow for the pot of gold on stock, it would have been [Muilenburg]."[64]  He also stated that there were "more [problems] than I

---

[63] Leslie Josephs and Thomas Franck, *CEO says Boeing will be quicker to ground planes in the event of future crashes*, CNBC, Nov. 6, 2019, https://www.cnbc.com/2019/11/06/boeing-ceo-says-will-more-readily-ground-planes-in-the-event-of-future-crashes.html.

[64] Kitreoff and Gelles, *Boeing's New C.E.O. Confronts Its Challenges*.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

imagined" in getting the MAX re-certified and that the problems were of Boeing's own making, reflecting "the weakness of [Boeing's] leadership."[65]

223.    On December 16, 2019, Boeing announced that it was shutting down production of the 737 MAX.  Boeing described the shutdown as "temporary," but also stated that it did not have a set date for when production would resume.  Suppliers have since said that as a result of ceasing production, it may take them as long as years before they are able to return to full capacity.

224.    As a result of the shutdown and the fact that Boeing has not even attempted to offer updated guidance on when the MAX will return to service, Norwegian has less confidence than ever as to if or when the MAX will be allowed to fly.

225.    Due to Boeing's tardy repair process and the never-ending stream of new MAX problems, Norwegian's MAX aircraft have been sitting on the tarmac, unusable, for over fifteen months.

226.    Even if the grounding is lifted and a software update is the only fix required, the planes will still remain grounded while necessary work is done to repair damage sustained from not being used for such a long period of time.

**Boeing Reverses Course and Recommends Simulator Testing,
While Acknowledging That Passengers Do Not Want to Fly a MAX**

227.    In January 2020, Boeing reversed its longstanding position on simulator training, and began "recommending" that pilots be trained in MAX simulators before flying MAX aircraft.[66]  As a result, assuming that the MAX is ever permitted to fly again, Norwegian and

---

[65] *Id.*

[66] *Boeing Statement on 737 MAX Simulator Training*, Boeing (Jan. 7, 2020), https://boeing.mediaroom.com/news-releases-statements?item=130596.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

other operators will need to spend millions of dollars to train their NG pilots on flight simulators, of which there are far too few to meet demand.

228.    Boeing's reversal with respect to MAX simulator testing means that it will not deliver one of its key promises to Norwegian and other airlines, and that the cost savings that Norwegian was promised when it ordered the MAX are evaporating even further.

229.    Boeing has also started sharing with airlines its own survey data showing that 40% or more of the traveling public is "unwilling to fly" on a MAX.  Boeing's surveys span months and multiple countries, and reflect travelers' persistent and strong aversion to flying on a MAX.  Boeing's solution has been to send airlines suggestions for what to do when passengers arrive at the airport or board an airplane and then realize they are about to travel on a MAX, which plainly reflects an expectation at Boeing that passengers will continue to have serious concerns about flying on the MAX even after it is recertified.

230.    The ongoing investigation into the MAX continues to reveal additional problems with the plane's design.  On June 24, 2020, the FAA finalized an additional directive to deal with the fact that exterior panels on top of the MAX's engines may not properly shield underlying wiring from the electromagnetic effects of high-power radio frequency transmitters and other sources.  That, the FAA warned, "could potentially lead to a dual-engine power loss event and/or display of hazardously misleading" data, which could result in a "forced off-airport landing." Other issues continue to surface as the MAX receives additional scrutiny, all of which will further delay the possibility of the MAX ever again leaving the ground, further erode the MAX's value and any sense of confidence Norwegian once had in the plane, and further exacerbate Norwegian's economic losses.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

**The Boeing 787**

231.    Similar to the MAX, Boeing went to great lengths to persuade Norwegian that the 787 would be a reliable aircraft that would enable Norwegian to profitably operate desired routes.  For instance, in one presentation to Norwegian on March 4, 2013, Boeing claimed that the 787 would allow Norwegian to serve "Key Markets in North/Central America and Asia from Oslo & Gatwick" and "key markets in Europe, M.E., Asia and Oceania from Bangkok."

232.    Boeing's marketing efforts emphasized the performance of the 787's engines, boasting that the 787 would offer Norwegian the "Lowest seat-mile cost of any airplane." Boeing, to this day, markets the 787 as offering "unparalleled fuel efficiency and range flexibility" and "enabl[ing] carriers to profitably open new routes as well as optimize fleet and network performance," boasting that the 787 offers "[a]round 20% better fuel per seat and emissions than the airplanes it will replace."[67]

233.    In reliance on these and other promises, Norwegian and Boeing entered into Purchase Agreement Number PA-03661 on May 10, 2011, under which Norwegian agreed to purchase 787-8 aircraft from Boeing.  On October 21, 2015, Boeing and Norwegian entered into Purchase Agreement Number PA-04424 Relating to Boeing Model 787-9 Aircraft (together with Purchase Agreement Number PA-03661 and their related amendments, supplements and modifications, the "787 Purchase Agreements"), which was for the purchase and sale of nineteen additional 787s.

234.    Throughout the 787 Purchase Agreements and incorporated letter agreements and amendments, Boeing warranted and represented that the 787 and its component parts would be

---

[67]    *787, It Reinvents Fleet Plans and Transforms Business Plans*, Boeing, https://www.boeing.com/commercial/787/.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

free from defects in design and construction.  Boeing also agreed that Norwegian could reject any aircraft that are "damaged beyond repair for any reason before delivery."

235.    Despite such warranties and representations, the 787s did not perform as promised.  Boeing has failed to remedy the issues—or even to provide any assurances as to when they will be remedied, if ever—and has instead demanded that Norwegian take delivery of additional 787 aircraft that Boeing knows remain defective and incapable of performing as promised.

### Norwegian's 787s Suffer from Serious Reliability Problems

236.    Although there have fortunately not been any tragic loss-of-life accidents from Boeing's 787 aircraft, the plane still suffers from serious reliability problems.

237.    In January 2013, virtually all 787s were grounded worldwide, including by the EASA, due to a series of electrical fires caused by a battery on the 787 overheating.  The grounding was lifted in March 2013, following changes to the 787's battery system.

238.    The battery issues were not the end of the 787's problems.  Norwegian and other airlines have also experienced serious engine reliability issues with the 787 where, as is the case with Norwegian's 787s, the planes are fitted with Rolls Royce Trent 1000 engines.

239.    In the summer of 2016, airlines discovered that fan blades in the engine were showing early signs of corrosion.  The corrosion issue forced airlines to ground their 787s with this corrosion issue while they repaired the problem.

240.    In April 2018, additional issues with the engines appeared, this time with the compressors.

241.    As a result, the EASA (which Norway, and by extension, Norwegian, follows) imposed new requirements for engine inspections on 787 aircraft with the Rolls Royce Trent

FILED DATE: 6/29/2020 4:53 PM    2020L006904

1000 engines. Instead of having to inspect the engines every 2,000 cycles (one takeoff and one landing equals a cycle), airlines were required to inspect the engines every 300 cycles. These inspections are time consuming and result in considerable time during which the aircraft is not in service. When an aircraft is on the ground getting inspected, Norwegian is unable to use the airplane for passenger flights.

242.    That is all the more true when, as has often been the case, inspections reveal problems requiring repairs and/or the removal of the engines entirely.

243.    In April 2018 the FAA issued an airworthiness directive requiring operators of certain 787s equipped with Trent 1000 engines to cease operating the planes on extended operations ("ETOPS") routes longer than 140 minutes from the closest diversion airport – a significant reduction from the planes' 330 minute ETOPS rating.[68]

244.    Norwegian has suffered enormous losses as a result of these issues, including damage to its brand resulting from using older, leased aircraft to operate existing flight routes that Norwegian intended to operate with new 787s. Norwegian has been forced to remove its 787 engines for maintenance hundreds of times—far above what is normal or expected—and has also experienced engine start malfunctions, worn turbine blades, and early deterioration of compressors that have required unscheduled replacements, shorter on-wing life, and more regular inspections.

245.    Norwegian was forced to end one of its weekly flights from Paris Orly airport to Newark airport due to mechanical issues with the 787. In addition, Norwegian had to wet-lease aircraft in order to operate the remaining weekly flights between Paris Orly and Newark.

---

[68] Stephen Trimble, *FAA limits ETOPS flights for certain R-R-powered 787s*, Flight Global, https://www.flightglobal.com/faa-limits-etops-flights-for-certain-r-r-powered-787s/127770.article

58

FILED DATE: 6/29/2020 4:53 PM    2020L006904

246.    On August 13, 2019, a Norwegian 787 had to return to Rome Fiumicino airport shortly after taking off after it suffered apparent engine failure.  The engine scattered searing metal debris and engine parts across a suburb close to the airport.

247.    In addition, Boeing has reportedly ignored and failed to address numerous complaints raised by its own employees complaining that Boeing is engaging in shoddy manufacturing processes in producing the 787, including workers regularly leaving metal shavings and other debris inside finished aircraft.

248.    Despite numerous employees raising concerns about these issues within Boeing, Boeing has failed to address them, undermining passenger confidence in Boeing products and the 787's market positioning as a premier product.

249.    Boeing's conduct with respect to the 787 and the MAX has substantially impaired the value of the Boeing brand and MAX and 787 aircraft.

**GoldCare**

250.    As part of its offering in connection with the MAX and the 787, Boeing offers a maintenance service called GoldCare, under which Boeing undertakes to perform certain maintenance and repair work on Boeing airplanes.

251.    Boeing markets GoldCare as a service to, among other things, "increase fleet availability and reliability."

252.    Norwegian agreed to purchase GoldCare in connection with its agreements to order MAXs and 787s.  GoldCare has no value to Norwegian without the expected number of aircraft Boeing is supposed to be maintaining.

253.    Boeing has not, however, complied with its obligations to build and deliver the aircraft Norwegian ordered and, to the contrary, fraudulently induced Norwegian into ordering

FILED DATE: 6/29/2020 4:53 PM   2020L006904

those aircraft. Boeing has further sought to profit from its misconduct by seeking to charge Norwegian additional amounts for undelivered and/or grounded aircraft, even though the delivery failures and grounding are entirely Boeing's fault.

254. Norwegian normally pays Boeing for maintenance based on an agreed formula that takes into account the number of Boeing aircraft enrolled in maintenance and the number of hours the aircraft are flown. Boeing agreed to reduce maintenance fees where the number of planes or hours are lower than expected due to various circumstances, including maintenance and reliability problems as well as epidemics and quarantine restrictions, but has refused to honor these obligations.

**Norwegian Has Suffered Significant Damages as a Result of Boeing's Conduct**

255. Boeing's conduct has caused significant financial and reputational damage to Norwegian.

256. As a result of the grounding, Norwegian cannot use its eighteen MAX aircraft, for which it paid more than $1 billion.

257. Boeing has also failed to deliver at least twenty-two additional MAX aircraft that it was required to deliver under the 737 Purchase Agreement and has been unable to provide Norwegian with any assurances as to when these aircraft will be delivered and how they will be altered to make them safe.

258. Boeing has also failed to offer any 787s that conform to Boeing's promises to Norwegian, and has, instead, offered 787s to Norwegian that Boeing knows are defective, including because they require extensive groundings and engine replacements.

259. Norwegian has been forced to cancel thousands of flights due to these issues.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

260.     Norwegian also had to lease replacement aircraft, at considerable cost, to continue to operate certain routes.

261.     Norwegian has also incurred myriad other costs as a result of the grounding, including the cost of operating flights on less fuel efficient aircraft, paying employees to handle greatly increased call center volumes, paying compensation to passengers whose flights were delayed or cancelled as a result of Norwegian not having the ability to use its MAX and 787 aircraft, and other costs.

262.     Norwegian has also been forced to end flights between Ireland and the U.S. as a result of the grounding.

263.     Boeing's conduct has resulted in losses to Norwegian exceeding $1 billion—a number that continues to increase.

264.     The grounding of the MAX and continued unavailability of the 787 threaten to undo Norwegian's plans to return to profitability.

265.     If and when the MAX returns to service, Norwegian will now have to invest millions to retrain its NG pilots to operate the MAX.

266.     Further, the substantial uncertainty regarding if or when the MAX will return to service has made it impossible for Norwegian to make accurate fleet decisions, including decisions about retiring NG aircraft that would have been replaced by MAXs.  This uncertainty further diminishes the value of Norwegian's remaining MAX order to Norwegian.

267.     As a result of all of the foregoing, the value of Norwegian's contracts with Boeing are substantially impaired.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

## CLAIMS ASSERTED

### COUNT I
### BREACH OF CONTRACT
### (MAX CONTRACTS)

268.     Norwegian hereby incorporates and realleges Paragraphs 1-267, as though fully set forth herein.

269.     Boeing and Norwegian are parties to the 737 Purchase Agreement, the supplemental agreements and letter agreements that relate thereto, and the AGTA.

270.     Pursuant to these agreements, Boeing was required, among other things, to deliver aircraft to Norwegian that are capable of being flown safely, are state of the art, meet all regulatory requirements, and conform to Boeing's contractual warranty.

271.     Boeing was also required to deliver the additional aircraft Norwegian ordered from Boeing in accordance with the contractual delivery schedule.

272.     Boeing has failed to do any of these things and has thus breached the AGTA and 737 Purchase Agreement, as amended.

273.     The eighteen MAX aircraft that Boeing delivered to Norwegian cannot even be flown, and thus plainly do not comply with Boeing's warranty or with applicable regulatory requirements and certificates.

274.     Boeing breached the terms of the AGTA and 737 Purchase Agreement, as amended, in not designing and manufacturing the MAX in accordance with FAA regulations and all other pertinent U.S. federal aviation regulations pertaining to type certificates that must be obtained for the design and manufacture of a new aircraft model.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

275.    The MAX aircraft that Boeing delivered to Norwegian are not state of the art and use outdated cockpit and flight control layouts that have not been state of the art since the 1960s, contrary to the representations Boeing made in the 737 Purchase Agreement.

276.    Boeing has also failed to deliver aircraft it was contractually obligated to deliver to Norwegian in accordance with the contractually mandated delivery schedule.

277.    Boeing's breaches were caused by its gross negligence.  As such, Boeing's contractual exculpatory clauses and liability limitations are unenforceable under Washington law.

278.    As set forth more fully throughout this complaint, Boeing's grossly negligent acts and/or omissions include, but are not limited to:

    a.    Designing, manufacturing, assembling, and/or certifying an aircraft with a pitch down system at high AOAs controlled by a single AOA sensor;

    b.    Designing manufacturing, assembling, and/or certifying an aircraft that violated a fundamental rule in airplane design that a single point of failure should not cause an aviation disaster;

    c.    Designing, manufacturing, assembling, and/or certifying an aircraft with only two AOA sensors, rather than the three such sensors installed on competing aircraft, making it impossible to develop a system such as MCAS that would not be forced to either disengage or activate erroneously if one AOA sensor were damaged;

    d.    Designing, manufacturing, assembling, and/or certifying an aircraft with a flight control system susceptible to bad data from the AOA sensor, and failing to install AOA indicators and/or AOA disagree lights as standard features rather than as optional upgrades;

FILED DATE: 6/29/2020 4:53 PM    2020L006904

e.      Designing, manufacturing, assembling, and/or certifying an aircraft with a flight control system that would initiate a dangerous automated dive without any command from a pilot and without a means to promptly override the automated dive;

f.      Designing, manufacturing, assembling, and/or certifying an aircraft with an antiquated cockpit alert system that would inundate pilots with a barrage of erroneous and real alerts during emergency situations, creating even more workload for pilots in an already high workload situation;

g.      Marketing and selling the MAX as having the same flight properties as the NG to consciously and intentionally induce airlines to avoid the time-consuming retraining of airline pilots with the knowledge that the MAX contained a new and potentially dangerous MCAS automated flight control system;

h.      Failing to provide adequate warning with regard to the MAX's MCAS and the risk of an automated dive without any command from a pilot, or clear instruction to promptly override such an MCAS automated dive;

i.      Failing to conduct a thorough and accurate safety assessment of the aircraft, including Boeing's failure in its safety assessment to account for the degree to which the MCAS could move the horizontal stabilizer of the aircraft and Boeing's failure to account for the resetting of the automated dive after each command from a pilot;

j.      Failing to properly train pilots on the new, automated MCAS systems on the MAX;

k.      Failing to properly train pilots to identify an AOA sensor failure and MCAS input;

FILED DATE: 6/29/2020 4:53 PM    2020L006904

l.      Failing to properly train pilots to disengage the stabilizer trim motor on the MAX in the event of an AOA sensor failure or unanticipated dive;

m.      Designing, assembling, and distributing a flight manual that did not warn of the risks presented by the MCAS, faulty AOA sensors, or automated dives;

n.      Designing, manufacturing, assembling, and/or certifying an airplane flight manual that failed to provide clear instruction or procedures on how to promptly override an automated MCAS dive and memory items to be required of pilots;

o.      Failing to promptly issue a software patch to address the risk of malfunctioning AOA sensors and automated MCAS dives following the October 29, 2018 crash of Lion Air Flight JT 610;

p.      Failing to properly warn pilots, airlines, and the public about the risk of malfunctioning AOA sensors and automated MCAS dives following the crashes of Lion Air Flight JT 610 and Ethiopian Airlines Flight ET 302; and

q.      Delivering an additional five MAXs to Norwegian after Boeing confirmed following the Lion Air crash that the MAX had critical safety flaws, without correcting the flaws or even properly informing Norwegian of them.

279.    Norwegian has performed all of its material obligations under the AGTA and 737 Purchase Agreement.

280.    Norwegian has suffered, and continues to suffer, damages as a result of Boeing's breaches of contract.

**WHEREFORE**, Norwegian respectfully requests that the Court enter a money judgment in its favor and against Boeing in an amount to be determined at trial, together with costs,

FILED DATE: 6/29/2020 4:53 PM   2020L006904

attorneys' fees, and such other damages to which it is entitled under applicable law.  Norwegian further demands a trial by jury of all claims so triable.

**COUNT II**
**DECLARATORY JUDGMENT**
**(MAX CONTRACTS)**

281.    Norwegian hereby incorporates and realleges Paragraphs 1-2677, as though fully set forth herein.

282.    As set forth above, Boeing has breached its MAX contracts with Norwegian.

283.    Boeing's breaches are material and gave Norwegian reasonable grounds for insecurity about Boeing's ability to perform its obligations in the future.

284.    As a result, Norwegian was entitled to demand that Boeing provide adequate assurances that it can and will perform its obligations under the agreements.  Norwegian was entitled to suspend performance until such assurances are received.

285.    Norwegian requested such assurances from Boeing.

286.    Boeing has not provided any adequate assurances to Norwegian regarding how it will fix the MAX, when it will fix the MAX, and when Boeing will be able to deliver aircraft to Norwegian that confirm to the contractual requirements.

287.    In addition, Boeing's conduct and material breaches of contract have substantially impaired the value of the 737 Purchase Agreement to Norwegian.  Boeing's conduct, including its decision to cease producing the MAX, constitutes both a repudiation of and a material breach of the 737 Purchase Agreement.

288.    Norwegian is therefore entitled to terminate the 737 Purchase Agreement, AGTA, and all related agreements, including but not limited to Norwegian's agreement to purchase 737 MAX GoldCare services from Boeing, and to receive damages.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

**WHEREFORE**, Norwegian respectfully requests that the Court grant rescission of the 737 Purchase Agreement, AGTA, and all related agreements, as well as entry of a money judgment against Boeing in an amount to be determined at trial, together with costs, attorneys' fees, and such other damages to which it is entitled under applicable law. Norwegian further demands a trial by jury of all claims so triable.

**COUNT III**
**BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**
**(MAX CONTRACTS)**

289. Norwegian hereby incorporates and realleges Paragraphs 1-2677, as though fully set forth herein.

290. Under Washington law, every contract contains an implied covenant of good faith and fair dealing. Where one party to the contract contravenes the intention and spirit of the contract, that party is liable for breach of the implied covenant of good faith and fair dealing.

291. Boeing's actions and/or omissions as set forth herein are in breach of the covenant of good faith and fair dealing implied and imputed in the AGTA and 737 Purchase Agreement, as amended.

292. Boeing's acts and/or omissions regarding the airworthiness of the MAX, its certification by regulators, and training requirements for pilots flying the MAX were contrary to the standards of good faith and fair dealing, and were made in such a manner as to evade the spirit of the AGTA and 737 Purchase Agreement, as amended, and/or so as to deny Norwegian the expected benefits of the transaction.

293. Boeing's breach of the implied covenant of good faith and fair dealing has caused, and continues to cause, damage to Norwegian.

FILED DATE: 6/29/2020 4:53 PM   2020L006904

**WHEREFORE**, Norwegian respectfully requests that the Court enter a money judgment in its favor and against Boeing in an amount to be determined at trial, together with costs, attorneys' fees, and such other damages to which it is entitled under applicable law. Norwegian further demands a trial by jury of all claims so triable.

**COUNT IV**
**FRAUDULENT INDUCEMENT**
**(MAX CONTRACTS)**

294. Norwegian hereby incorporates and realleges Paragraphs 1-2677, as though fully set forth herein.

295. Boeing represented to Norwegian that the MAX was a safe aircraft and the "short-haul plane of the future."

296. Boeing further represented to Norwegian that the MAX aircraft it would deliver to Norwegian would meet all regulatory requirements and would be free from defects in material, process of manufacture, and workmanship in view of the state of the art at the time of design.

297. Boeing further represented to Norwegian that Norwegian's flight crews would be "at home" in the MAX, that Norwegian would not need to provide its NG pilots with any additional training, and that Norwegian would save "millions of dollars" because of the MAX's "commonality with the Next-Generation 737, ease of maintenance, wide availability of 737 pilots, and the global infrastructure that supports the aircraft in operation."

298. Boeing further represented to Norwegian that the MAX would deliver specific fuel savings for Norwegian as compared to the MAX's NG predecessor, and that the MAX would offer "aerodynamic improvement" over the NG.

299. Boeing further represented to Norwegian that the MAX aircraft would be state of the art.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

300.    Boeing made these promises to induce Norwegian to order MAX airplanes.  For instance, in a December 8, 2011 presentation Boeing made to Norwegian just weeks before Norwegian placed its first order for the MAX, Boeing represented that its MAX design "permits an optimal 68" fan diameter engine without structural or aerodynamic compromises."  Boeing further claimed that "[t]he Leap-1B engine installation on the 737 MAX is well understood in terms of structural & aerodynamic integration" and that "[t]he 68" fan integrates into the 737 wing without compromise."

301.    Boeing also made promises regarding pilot training, including that the MAX offered the "[s]implest pilot transition"; that pilots would only need the "[s]ame 'B737' Pilot Type Rating"; and that there would be the "[s]ame instructors, examiners, line training captains and line pilots" for the MAX and NG, with "'check ride' not required" (check ride being a common name for flight simulator training for pilots).

302.    Boeing made these promises to Norwegian knowing that they were false, or with reckless indifference to their falsity.  For instance, Boeing promised another customer, Southwest Airlines, that it would pay it a $1 million-per-plane refund if pilot simulator training were required—proof that Boeing knew it might not be able to deliver on its "no simulator" training promise.  Moreover, Boeing's conduct in procuring regulatory approval not to require similar training demonstrates that Boeing knew it could not deliver on its promise without misleading regulators.

303.    In fact, Boeing had already studied the challenges associated with re-engining the NG years earlier, and fully understood that the project would alter the aircraft's aerodynamic properties.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

304.     Boeing had confronted a similar problem when it designed the KC-46A Pegasus tanker for the U.S. Air Force.  That aircraft stored extra fuel in tanks along the wings, which created pitch-up problems similar to those caused by the MAX's large engines.  Boeing solved the Pegasus's problem with a system similar to MCAS, but designed that system with multiple safeguards to prevent erroneous activation and ensure pilot control.  Boeing did not adhere to those design principles when designing MCAS.

305.     Boeing knew that it would not deliver a state-of-the-art aircraft to Norwegian, because it was secretly seeking permission from the FAA to have the flight controls and cockpit layout conform to a design that had not been state-of-the-art since the 1960s.

306.     Boeing intentionally misrepresented and concealed information about the MAX from Norwegian to induce Norwegian to purchase the MAX and to continue to enter into additional agreements with Boeing regarding the MAX, including agreements to order additional MAX aircraft and GoldCare services for the MAX.

307.     Among other misrepresentations and nondisclosures, Boeing failed to disclose to Norwegian, and actively concealed, that the MAX had a tendency to experience abnormal nose-up pitching, which is prohibited by FAA airworthiness regulations, including under 14 C.F.R. § 25.203(a).

308.     Boeing also failed to disclose, and actively concealed, from Norwegian that it had developed MCAS to try to counter the MAX's undisclosed nose-up pitching problem; that MCAS was incorporated on the MAX and could, under certain conditions, cause the plane to crash; or that Boeing had designed MCAS with a single-point of failure that could lead to a crash of the MAX.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

309.    Boeing further misrepresented to Norwegian that the MAX would not require additional pilot training, even though Boeing knew the MAX was substantially different from the NG, handled differently from the NG due to its larger engines and engine placement, and included MCAS, an entirely new flight control system that was equipped with the power to override pilot inputs and force the MAX into a nosedive.

310.    Boeing misrepresented to Norwegian that the MAX would fly similarly to the NG, when it knew that the MAX would not do so.

311.    Boeing also misrepresented to Norwegian that the MAX would be safe and airworthy, and that it had been designed in compliance with aviation regulations.

312.    Boeing's misrepresentations and omissions were false and misleading.

313.    Boeing's misrepresentations and omissions were also material.    Airlines, including Norwegian, would have had different calculations about price and whether to purchase the MAX if they knew the MAX would be designed and built in great haste, had aerodynamic problems, would include a software fix for those problems that overrode pilots and could force the plane to plummet based on a single point of failure, was not state of the art, and had substantial differences from the NG that required additional pilot training.

314.    As reports from current and former employees in media accounts show, Boeing knew that these misrepresentations and omissions were false or misleading or acted with a reckless disregard as to the veracity of its statements or omissions.

315.    Norwegian relied on Boeing's material misrepresentations and omissions in determining to purchase MAX aircraft over other alternatives, and in determining to enter into amendments and supplemental agreements and letter agreements with Boeing regarding

FILED DATE: 6/29/2020 4:53 PM    2020L006904

Norwegian's MAX order, including Norwegian's 2017 agreement to order an additional ten MAX aircraft from Boeing.

316.    Norwegian reasonably relied on Boeing's promises and representations.

317.    Boeing made the false and misleading statements and omissions described in this complaint with the intent of inducing Norwegian to purchase MAX aircraft over other alternatives, to enter into amendments and supplemental agreements and letter agreements with Boeing regarding Norwegian's MAX order, and to order additional MAX aircraft from Boeing.

318.    Norwegian has suffered, and continues to suffer, damages as a result of Boeing's misrepresentations and omissions.

**WHEREFORE**, Norwegian respectfully requests that the Court enter a money judgment in its favor and against Boeing in an amount to be determined at trial, together with costs, attorneys' fees, and such other damages to which it is entitled under applicable law.  Norwegian further demands a trial by jury of all claims so triable.

## COUNT V
## BREACH OF CONTRACT
## (787 CONTRACTS)

319.    Norwegian hereby incorporates and realleges Paragraphs 1-267, as though fully set forth herein.

320.    Boeing and Norwegian are parties to the 787 Purchase Agreements, and all related amendments, modifications, and supplements thereto.

321.    Pursuant to those agreements, Boeing was required, among other things, to deliver aircraft to Norwegian that are not damaged, are capable of being flown safely, are state of the art, meet all regulatory requirements, conform to Boeing's contractual warranty, and are capable of being used as reasonably expected and intended.

FILED DATE: 6/29/2020 4:53 PM    2020L006904

322.    Boeing has failed to deliver and offer for delivery 787 aircraft to Norwegian that comply with these obligations.

323.    Norwegian has been, and continues to be, damaged by Boeing's conduct.

**WHEREFORE**, Norwegian respectfully requests that the Court enter a money judgment in its favor and against Boeing in an amount to be determined at trial, together with costs, attorneys' fees, and such other damages to which it is entitled under applicable law.  Norwegian further demands a trial by jury of all claims so triable.

### COUNT VI
### <u>BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING</u>
### <u>(787 CONTRACTS)</u>

324.    Norwegian hereby incorporates and realleges Paragraphs 1-2677, as though fully set forth herein.

325.    Under Washington law, every contract contains an implied covenant of good faith and fair dealing.  Where one party to the contract contravenes the intention and spirit of the contract, that party is liable for breach of the implied covenant of good faith and fair dealing.

326.    Boeing's actions and/or omissions as set forth herein are in breach of the covenant of good faith and fair dealing implied and imputed in the 787 Purchase Agreements and their related agreements, amendments, supplements, and modifications.

327.    By seeking to deliver, and actually delivering, 787 aircraft to Norwegian that Boeing knew were damaged and could not perform as promised, expected, or intended, Boeing acted contrary to the standards of good faith and fair dealing and in such a manner as to evade the spirit of the 787 Purchase Agreements, and/or so as to deny Norwegian the expected benefits of the transaction.

328.     Boeing's breach of the implied covenant of good faith and fair dealing has caused, and continues to cause, damage to Norwegian.

**WHEREFORE**, Norwegian respectfully requests that the Court enter a money judgment in its favor and against Boeing in an amount to be determined at trial, together with costs, attorneys' fees, and such other damages to which it is entitled under applicable law.  Norwegian further demands a trial by jury of all claim so triable.

**COUNT VII**
**DECLARATORY JUDGMENT**
**(787 CONTRACTS)**

329.     Norwegian hereby incorporates and realleges Paragraphs 1-2677, as though fully set forth herein.

330.     As set forth above, Boeing has breached the 787 Purchase Agreements.

331.     Boeing's breaches are material and gave Norwegian reasonable grounds for insecurity about Boeing's ability to perform its obligations in the future.

332.     As a result, Norwegian was entitled to demand that Boeing provide adequate assurances that it can and will perform its obligations.  Norwegian was entitled to suspend performance until such assurances are received.

333.     Norwegian requested such assurances from Boeing.

334.     Boeing has not provided any adequate assurances to Norwegian regarding when or how it will be able to deliver conforming 787 aircraft to Norwegian or how it will maintain the residual value of 787 aircraft in light of the damage Boeing has done to its brand.

335.     Instead, Boeing has sought to deliver aircraft to Norwegian with engines that Boeing knows do not work properly.

FILED DATE: 6/29/2020 4:53 PM   2020L006904

336.     Norwegian has a contractual right to refuse delivery of such aircraft and to receive a refund for amounts paid, and properly exercised that right.

337.     Boeing wrongfully refused to refund monies paid in connection with terminated aircraft.

338.     In addition, Boeing's conduct and material breaches of contract have substantially impaired the value of the 787 Purchase Agreements to Norwegian.  Boeing's conduct constitutes both a repudiation of and a material breach of the 787 Purchase Agreements.

339.     Norwegian is therefore entitled to terminate the 787 Purchase Agreements and all related agreements, including but not limited to Norwegian's agreement to purchase 787 GoldCare services from Boeing, and to receive damages.

**WHEREFORE**, Norwegian respectfully requests that the Court grant rescission of the 787 Purchase Agreements and all related agreements, as well as entry of a money judgment against Boeing in an amount to be determined at trial, together with costs, attorneys' fees, and such other damages to which it is entitled under applicable law.  Norwegian further demands a trial by jury of all claims so triable.

**COUNT VIII**
**DECLARATORY JUDGMENT**
**(GOLDCARE CONTRACTS)**

340.     Norwegian hereby incorporates and realleges Paragraphs 1-2677, as though fully set forth herein.

341.     Norwegian and Boeing entered in GoldCare contracts with Boeing in connection with Norwegian's 737 MAX and 787 aircraft orders (the "GoldCare Contracts").

342.     Norwegian only purchased GoldCare in anticipation of Boeing delivering conforming MAXs and 787s.   Receipt of such aircraft was a condition precedent for

FILED DATE: 6/29/2020 4:53 PM   2020L006904

Norwegian's commitment to purchase GoldCare for MAXs and 787s. Norwegian's purchase of GoldCare makes no sense separate and apart from its MAX and 787 contracts.

343. Boeing fraudulently induced Norwegian into purchasing MAX aircraft and materially breached the MAX and 787 contracts as set forth herein, justifying termination of the contracts.

344. Without the underlying MAX and 787 contracts, performance of the GoldCare service is impracticable and impossible, because there are no airplanes for Boeing to perform maintenance on.

345. Norwegian is therefore entitled to a declaration that it may terminate the GoldCare Contracts with Boeing and to a declaration that it was not required to make GoldCare payments while it was unable to operate its MAX or 787 aircraft.

**WHEREFORE**, Norwegian respectfully requests that the Court grant rescission of the Goldcare Contracts and all related agreements, as well as entry of a money judgment against Boeing in an amount to be determined at trial, together with costs, attorneys' fees, and such other damages to which it is entitled under applicable law. Norwegian further demands a trial by jury of all claims so triable.

**COUNT IX**
**BREACH OF CONTRACT**
**(GOLDCARE CONTRACTS)**

346. Norwegian hereby incorporates and realleges Paragraphs 1-2677, as though fully set forth herein.

347. Norwegian and Boeing entered in the GoldCare Contracts with Boeing in connection with Norwegian's MAX and 787 aircraft orders.

76

FILED DATE: 6/29/2020 4:53 PM    2020L006904

348.    Norwegian only purchased GoldCare in anticipation of Boeing delivering conforming MAXs and 787s.    Receipt of such aircraft was a condition precedent for Norwegian's commitment to purchase GoldCare for MAXs and 787s.    Norwegian's purchase of GoldCare makes no sense separate and apart from its MAX and 787 contracts.

349.    Boeing fraudulently induced Norwegian into purchasing MAX aircraft and materially breached the MAX and 787 contracts as set forth herein, justifying termination of the contracts.

350.    Without the underlying MAX and 787 contracts, performance of the GoldCare service is impracticable and impossible, because there are no airplanes for Boeing to perform maintenance on.

351.    Boeing further refused to honor its contractual obligation under the GoldCare contracts to adjust its GoldCare charges to take into account the fact that the MAX and 787 do not work properly and other circumstances.    Boeing's refusal to honor these obligations constitutes a material breach of its obligations under the GoldCare Contracts.

352.    Norwegian has been damaged by Boeing's breaches of the GoldCare contracts, and is entitled to terminate those contracts.

**WHEREFORE**, Norwegian respectfully requests that the Court enter a money judgment in its favor and against Boeing in an amount to be determined at trial, together with costs, attorneys' fees, and such other damages to which it is entitled under applicable law.    Norwegian further demands a trial by jury of all claim so triable.

## REQUEST FOR RELIEF

**WHEREFORE**, Norwegian respectfully requests that the Court enter judgment and the following relief in its favor and against Boeing as follows:

FILED DATE: 6/29/2020 4:53 PM  2020L006904

a.      Awarding compensatory and consequential damages sustained as a result of Boeing's wrongdoing and breach of contract, in an amount to be proven at trial, including interest;

b.      Rescinding the MAX and 787 Purchase Agreements;

c.      Declaring that Norwegian was entitled to suspend performance under the 737 Purchase Agreement, the 787 Purchase Agreements and the GoldCare Contracts due to Boeing's material breaches and failure to provide adequate assurances to Norwegian;

d.      Declaring that Norwegian is entitled to terminate the 737 Purchase Agreement and 787 Purchase Agreements;

e.      Declaring that Norwegian is entitled to terminate its GoldCare contracts with regard to its MAX and 787 purchases;

f.      Awarding Norwegian its reasonable costs and expenses, including counsel fees and expert fees; and

g.      Awarding such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury of all claims so triable.

Dated:  June 29, 2020

Respectfully submitted,

_____

Adam J. Levitt
John E. Tangren
Brittany Hartwig
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois  60602
Telephone:  312-214-7900
Facsimile:  312-253-1443
alevitt@dicellolevitt.com
jtangren@dicellolevitt.com
bhartwig@dicellolevitt.com
Attorney No. 61428

Dennis H. Tracey III
David R. Michaeli
**HOGAN LOVELLS US LLP**
390 Madison Avenue
New York, New York  10017
Telephone:  212-918-3524
Facsimile:  212-918-3100
dennis.tracey@hoganlovells.com
david.michaeli@hoganlovells.com

*Counsel for Plaintiffs*

79

FILED DATE: 6/29/2020 4:53 PM    2020L006904